## MATTHEW ADDY COMPANY *v.* UNITED STATES.

## FORD *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

Nos. 84 and 85.  Argued October 17, 18, 1923.—Decided February 25, 1924.

1. In a prosecution for violation of an order of the President fixing prices of coal, under the Lever Act (August 10, 1917, c. 53, § 25, 40 Stat. 276), the order must be construed, as criminal statutes are, strictly, and without retroactive effect unless clearly indicated. P. 244.
2. A construction which raises a grave constitutional question should be avoided.  P. 245.
3. *Quaere:* Whether Congress, when enacting the Lever Act, could constitutionally have fixed prices at which persons then owning coal might sell it, without providing compensation for losses?  *Id.*
4. The President's Order of August 23, 1917, limiting jobbers to a gross margin of 15¢ per ton in reselling bituminous coal, did not apply to sales f. o. b. the mines, contracted and made by jobbers after the date of the order, of coal purchased by them f. o. b. the mines before the dates of the order and the Lever Act.  P. 245.

281 Fed. 298, reversed.

CERTIORARI to judgments of the Circuit Court of Appeals affirming fines imposed on the petitioners, in criminal prosecutions based on the Lever Act.

*Mr. Julius R. Samuels,* with whom *Mr. Nelson B. Cramer* was on the briefs, for petitioners.

*Mr. Geo. Ross Hull,* Special Assistant to the Attorney General, for the United States.

The Executive Order of August 23, 1917, applied to sales for which the defendants were indicted.

Evidence offered to prove that the gross margin fixed by the Executive Order would not allow the defendants any profit was properly excluded.

The indictments were sufficient. The President had power to fix prices without the aid or coöperation of the Federal Trade Commission. The allegations of the indictments are definite and certain.

The Executive Order was not a taking of property without due process of law in violation of the Fifth Amendment. It was valid, regardless of whether the defendants could conduct their business profitably thereunder. Congress, in the exercise of the war power, may control and regulate or may prohibit and destroy the business of trading in coal.

If it be necessary that the jobber's margin be a profitable one, nevertheless the ascertainment of that fact by judicial process is not essential to due process of law.

The Lever Act and the Executive Order did not take the defendants' property.

The Lever Act did not delegate legislative or judicial power in violation of the Constitution.

The Lever Act was not an abuse of the congressional power to provide for the national security and defense, nor was it an invasion of the reserved powers of the State.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

The petitioners were found guilty of violating the President's order of August 23, 1917, by receiving margins above those prescribed for coal jobbers. Both causes present the same fundamental questions and one opinion will suffice.

The Lever Act, "An Act To provide further for the national security and defense by encouraging the production,

conserving the supply, and controlling the distribution of food products and fuel," approved August 10, 1917, c. 53, 40 Stat. 276, 284, 286, provides—

" Sec. 25. That the President of the United States shall be, and he is hereby, authorized and empowered, whenever and wherever in his judgment necessary for the efficient prosecution of the war, to fix the price of coal and coke, wherever and whenever sold, either by producer or dealer, to establish rules for the regulation of and to regulate the method of production, sale, shipment, distribution, apportionment, or storage thereof among dealers and consumers, domestic or foreign; said authority and power may be exercised by him in each case through the agency of the Federal Trade Commission during the war or for such part of said time as in his judgment may be necessary. . . .

" Whoever shall, with knowledge that the prices of any such commodity have been fixed as herein provided, ask, demand, or receive a higher price, or whoever shall, with knowledge that the regulations have been prescribed as herein provided, violate or refuse to conform to any of the same, shall, upon conviction, be punished by fine of not more than $5,000, or by imprisonment for not more than two years, or both. Each independent transaction shall constitute a separate offense."

" Sec. 26. That any person carrying on or employed in commerce among the several States, or with foreign nations, or with or in the Territories or other possessions of the United States in any article suitable for human food, fuel, or other necessaries of life, who, either in his individual capacity or as an officer, agent, or employee of a corporation or member of a partnership carrying on or employed in such trade, shall store, acquire, or hold, or who shall destroy or make away with any such article for the purpose of limiting the supply thereof to the public or affecting the market price thereof in such commerce, whether

97851°—24——16

temporarily or otherwise, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both."    .   .   .

On August 21, 1917, after prescribing a schedule of prices for bituminous coal at the mine, the President said: " It is provisional only.   It is subject to reconsideration when the whole method of administering the fuel supplies of the country shall have been satisfactorily organized and put into operation.   Subsequent measures will have as their object a fair and equitable control of the distribution of the supply and of the prices not only at the mines but also in the hands of the middlemen and the retailers."

August 23, 1917, pending further investigation and determination, it was ordered by the President—" a coal jobber is defined as a person (or other agency) who purchases and resells coal to coal dealers or to consumers without physically handling it on, over, or through his own vehicle, dock, trestle, or yard.   For the buying and selling of bituminous coal a jobber shall not add to his purchase price a gross margin in excess of 15 cents per ton of 2000 pounds, nor shall the combined gross margins of any number of jobbers who buy and sell a given shipment or shipments of bituminous coal exceed 15 cents per ton of 2000 pounds."

September 6, 1917, the Fuel Administrator directed, that " contracts relating to bituminous coal made before the proclamation of the President on August 21, and contracts relating to anthracite coal made before the President's proclamation of August 23, are not affected by these proclamations, provided the contracts are bona fide in character and are enforcible at law."   [On August 23 the President issued an order fixing prices for anthracite coal at the mines, effective September 1st.]

A statement and order by the Fuel Administrator, dated September 7, 1917, contained the following paragraphs.

"A very large proportion of the coal supply available for the coming winter is under contract. These contracts, which are allowed to stand for the present, were made prior to the President's proclamation and very largely limit the amount which may be placed on sale at retail prices based on the President's order.

"It is absolutely essential, however, that a sufficient amount of coal be put on the market at once at these prices to meet the needs of domestic consumers. The Fuel Administration believes that this supply of coal can be made available and will be made available by voluntary arrangement between the operators and those with whom they have contracts, and thus make it unnecessary for the Fuel Administration to exercise or recommend the exercise of the powers provided in the Lever Act."

On October 6, 1917, the Fuel Administrator further directed—

"Coal may be bought and sold at prices lower than those prescribed by the orders of the President.

"The effect of the President's orders on coal rolling when the order affecting such coal was issued is to be decided by first ascertaining whether or not the title had passed from the operator to the consignee at the time the President's order became effective. If the title had passed to the consignee, the price fixed by the President does not apply. . . .

"A jobber who had already contracted to buy coal at the time of the President's order fixing the price of such coal, and who was at that time already under contract to sell the same, may fill his contracts to sell at the price named therein.

"A jobber who, at the time of the President's order fixing the price of the coal in question at the mine, had contracted to buy coal at or below the President's price, and at that time had no contract to sell such coal, shall not sell the same at a price higher than the purchase price plus

the proper jobber's commission as determined by the President's regulation of August 23, 1917.

"A jobber who, at the time of the President's order fixing the price of the coal in question, was under contract to deliver such coal at a price higher than a price represented by the price fixed by the President or the Fuel Administrator for such coal plus a proper jobber's commission as determined by the President's regulation of August 23, 1917, shall not fill such contract at a price in excess of the President's price plus the proper jobber's commission, with coal purchased after the President's order became effective and not contracted for prior thereto.

"A jobber who, at the date of the President's order fixing the price of the coal in question, held a contract for the purchase of coal without having already sold such coal, shall not sell such coal at more than the price fixed by the President or the Fuel Administrator for the sale of such coal after the date of such order, plus the jobber's commission as fixed by the President's regulation of August 23, 1917."

The Fuel Administrator issued many other orders, not presently important.

The petitioning corporation, Matthew Addy Company, acting by petitioner Ford, the Vice President, did business as coal jobber at Cincinnati, Ohio. By contract dated July 31, 1917, it purchased many carloads of coal from Bluefield Coal and Coke Company, at $3.25 per ton f. o. b. the mines in West Virginia. With knowledge of jobbers' margins fixed by the President's order of August 23, 1917, it sold sundry lots of this coal during August and September, 1917, at $3.50 per ton f. o. b. the mines, without having contracted so to do before that order issued. Do these circumstances suffice to establish the offense charged? We think not; and, accordingly, the judgments below must be reversed.

The order must be construed as criminal statutes are—strictly and without retroactive effect unless clearly indi-

cated. *Chew Heong* v. *United States,* 112 U. S. 536, 559; *Shwab* v. *Doyle,* 258 U. S. 529, 534. If it be construed as applying to the sales of coal purchased by petitioners prior to August 23rd, we must decide a grave constitutional question, not necessary to consider if another view be accepted. Under the existing circumstances, did Congress have power to fix prices at which persons then owning coal must sell thereafter, if they sold at all, without providing compensation for losses? If this difficulty can be eliminated by some reasonable construction of the order, it should be accepted. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407, 408.

The above quoted statements and orders show plainly enough that in August, 1917, a very large part of the available coal supply was under contract. This greatly limited the amount which "may be placed on sale at retail prices based on the President's order," as pointed out on September 7th. Nevertheless, the contracts were "allowed to stand for the present." Evidently the purpose was to begin the administration of the fuel supplies by regulating subsequent transactions without striking down all existing *bona fide* contracts which might affect such supplies. If, prior to August 23rd, petitioners had agreed to sell coal purchased in July, such contracts would not have been within the order. October 6th more sweeping rules were promulgated; one of them has direct relation to circumstances like those here presented.

The order treated buying and selling as integral parts of the regulated transaction and made no reference to expenses incident thereto. If it applied only to transactions thereafter begun, all had opportunity to govern themselves accordingly; but, if given retroactive effect, jobbers who had negotiated purchases at costs exceeding fifteen cents per ton would necessarily lose if they sold, although they had acted in entire good faith. Certainly, there was no purpose to encourage hoarding, contrary to

the Lever Act, § 26, or to retard movement of fuel to the ultimate consumers by making sales unprofitable. No imperative reason appears for treating jobbers who had bought but had not contracted to sell with less consideration than was accorded those with agreements for sales, irrespective of the stipulated price.

Considering the ordinary rules of interpretation and the circumstances disclosed, we conclude that the order of August 23rd did not apply to the sales in question. It was not retroactive, and the sales were but part of a transaction begun before its date. We are not unmindful of the forceful argument to the contrary; and we consciously refrain from indicating any opinion respecting the validity of the order as interpreted.

The judgments of the court below are reversed and the causes will be remanded to the District Court for further proceedings in harmony with this opinion.

*Reversed.*