## UNITED STATES v. McFARLAND et al.

(Circuit Court of Appeals, Fourth Circuit. October 19, 1926.)

No. 2429.

1. **War** ⚖➡14.

President, as Commander-in-Chief of the Army and Navy, has constitutional power in war time to appropriate private property for public use; government being bound to make just compensation therefor.

2. **War** ⚖➡14.

Statutes empowering executive agents to fix prices *held* not to authorize final determination as to what any one must take for property wanted by the government.

3. **Eminent domain** ⚖➡69.

Constitutional requirement that government must pay just compensation for what it takes is not suspended by war.

4. **War** ⚖➡14.

In absence of agreement between owner and government, just compensation is judicial question to be decided by the courts.

5. **War** ⚖➡4.

Regulations of War Industries Board, organized by Council of National Defense created under Act Aug. 29, 1916, § 2 (Comp. St. § 3115a), forbidding more than 4 per cent. profit by wool dealers, *held* unauthorized under Constitution or statutes; Lever Act, § 5 (Comp. St. § 3115⅛g), being inapplicable.

6. **War** ⚖➡4.

Agriculture Appropriation Bill for 1920 and subsequent appropriation acts, authorizing ap-

propriation for Bureau of Markets to collect and distribute excess profits made by wool dealers, *held* not ratification of regulations of War Industries Board limiting profit.

**7. Evidence ☞34.**

Judicial notice will be taken of legislative history of provisions claimed to have ratified and legalized regulations of War Industries Board.

**8. United States ☞68.**

Promise to return to government excess profits, not forbidden by some rule of public policy, is binding, whether or not government had right to require such promise.

**9. War ☞4.**

Wool dealer, who received copy of regulations of War Industries Board and proceeded thereunder, *held* not to have agreed by such conduct to return to government excess profits in accordance with regulations.

**10. Estoppel ☞63.**

That wool dealer, after close of season's business, made report as required by regulations of War Industries Board, *held* not to estop him from disputing other provisions in regulations.

**11. War ☞14.**

Wool dealer, continuing in business after regulation of industries by War Industries Board, properly defended action against them for excess profits, and need not have sought injunctive relief when regulations issued.

**12. War ☞4.**

Requirement in regulations of War Industries Board that wool dealers surrender excess profits to government, being in nature of penalty, is invalid, as being beyond power of board.

**13. Damages ☞85.**

One cannot by agreement subject himself to payment of penalty for something he may hereafter do.

**14. Constitutional law ☞197.**

Congress may not ratify imposition of penalty after the act to be penalized has been committed.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Suit by the United States against W. A. McFarland and another, copartners trading as Henry Marcus & Son. Judgment for defendants, and the United States brings error. Affirmed.

J. S. Bohannan, Asst. to the Sol. of U. S. Department of Agriculture, of Washington, D. C. (A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and H. H. Clarke, Asst. to the Sol. of U. S. Department of Agriculture, of Washington, D. C., on the brief), for the United States.

William H. Hudgins, of Baltimore, Md., and Lothrop Withington, of Boston, Mass.

(Alexander Lincoln and Claude B. Cross, both of Boston, Mass., on the brief), for defendants in error.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

ROSE, Circuit Judge. This is one of many suits which have been brought by the United States, hereinafter called the government, to recover from dealers in wool profits which the plaintiff says the defendants, during the year 1918, made in excess of the maximum permitted by the "regulations" promulgated by the Wool Division of the War Industries Board for the handling of the wool clip of that year. Among the reported cases dealing with some of the questions raised are United States v. Powers (D. C.) 274 F. 131; United States v. Smith (D. C.) 285 F. 751; United States v. Gordin (D. C.) 287 F. 565, and the same case on writ of error (C. C. A.) 9 F.(2d) 394; United States v. Traugott Schmidt & Sons (D. C.) 2 F.(2d) 290. The opinions in some of them review in more or less detail the conditions which led up to the issuance of the regulations in question, but it has seemed expedient to us to make from the record before us our own rather full statement of what we understand them to have been.

**The Legal Status of the War Industries Board.**

On August 29, 1916 (39 Stat. 619, 649), more than seven months before we entered the World War, Congress, in anticipation of the possibilities of the future, created a Council of National Defense. It was to be made up of six Cabinet ministers; that is to say of the Secretaries of War, of the Navy, of the Interior, of Agriculture, of Commerce, and of Labor. Its purpose was the "co-ordination of industries and resources for the national security and welfare." Comp. St. § 3115a. Its duties, among other things not here material, were "to supervise and direct investigations and to make recommendations to the President and heads of executive departments as to * * * data as to the amounts, location, method and means of production and availability of military supplies, the giving of information to producers and manufacturers as to the class of supplies needed in the military and other services of the government, the requirements relating thereto and the creation of relations which will render possible in time of need the immediate concentration and utilization of the resources of the nation." Comp. St. § 3115c. In short, it was to in-

quire, to consider and to recommend. It was empowered to "adopt rules and regulations *for its work*" and "to organize subordinate bodies for its assistance in special investigations either by the employment of experts or the creation of committees." Comp. St. § 3115d. The italics are ours.

On the 6th of April, 1917, we declared war on Germany. Nearly four months later—that is, on July 28th—the Council of National Defense, with the approval of the President, doubtless under the grant of power to create committees, organized what it called "a small body, to be known as the War Industries Board," "to furnish needed assistance to the departments engaged in making war purchases." Something over seven months afterwards—that is, on March 4, 1918—the President by letter of that date reconstituted this board. He undertook to remove it from its subordination to the Council of National Defense, and he made it an administrative agency directly responsible to himself. He said that, among other duties, it was to give "advice to the several purchasing agencies of the government with regard to the prices to be paid." He charged it with "the determination whenever necessary of priorities of production and of delivery, and of the proportion of any given article to be made immediately accessible to the several purchasing agencies when the supply of that article is insufficient, either temporarily or permanently."

The board was to have in most respects the constitution it then had, and was to retain its existing advisory agencies so far as was necessary and consistent with the character and purposes of the reorganization; but the ultimate decision of all questions, except the determination of prices, was to rest always with its chairman, the other members acting in a co-operative and advisory capacity. In determining prices, the chairman was to be governed by the advice of a committee consisting, in addition to himself, of the members of the board immediately charged with the study of raw materials and of manufactured products, of the labor member of the board, of the chairman of the Federal Trade Commission, of the chairman of the Tariff Commission, and of the Fuel Administrator.

The President said that the duties of the chairman were to act for the joint and several benefit of all the supply departments of the government; to let alone what is being successfully done, and to interfere as little as possible with the present normal processes of purchase and delivery in the several departments; to guide and assist wherever the need for guidance or assistance may be revealed, for example, in the allocation of contracts, in obtaining access to materials in any way pre-empted, or in the disclosure of sources of supply; to determine what is to be done when there is any competitive or other conflict of interest between departments in the matter of supplies; to anticipate the prospective needs of the several supply departments of the government and their feasible adjustment to the industry of the country as far in advance as possible, in order that as definite an outlook and opportunity for planning as possible may be afforded the business men of the country; and in brief to "act as the *general eye* of all supply departments in the field of industry." Again the italics are furnished by us.

The government in its brief suggests that if, at the time the President reorganized the board, there was any doubt as to his legal power to do so, it was removed by the Overman Act of May 20, 1918 (40 Stat. 556 [Comp. St. §§ 283a–283f]), which empowered him "to make such redistribution of functions among the executive agencies as he may deem necessary," and by his subsequently issued executive order of May 29, establishing the War Industries Board as a separate administrative agency, to act for him and under his direction, with the functions, duties, and powers outlined in the letter of March 4, already summarized.

At some date not stated in the record, but apparently prior to April 19, the board had created certain "commodity sections," among them the "Wool Division," whose members, or some of them, were experts taken from that industry.

### The Demand for Wool in 1918.

At least as early as the beginning of April, 1918, it became evident to the Quartermaster General of the Army that before December 31 of that year the government, in order to clothe its armed men, would need about 125,000,000 pounds of scoured wool. There were 56,000,000 immediately available, leaving 69,000,000 to be supplied from the domestic clip of the then current year, which it was estimated would yield about 120,000,000 pounds of the scoured article. If from this total 69,000,000 pounds were taken for the use of the military forces, on land and sea, there would be left for the civilian population but 51,000,000 pounds, or less than one-quarter of the quantity ordinarily required in peace times.

If the laws of supply and demand were allowed unchecked operation, prices might go

to unheard-of heights; they were already two or three times as high as they had been in the years immediately preceding August 1, 1914. Faced by such conditions, the Quartermaster General sought the advice and assistance of the War Industries Board. On the 15th of April, his office put, in the form of a letter to it, the substance of some conversations held some days earlier with some of its members. In this communication it was suggested, among other things, that the wool growers, wool dealers, and wool manufacturers be called together to discuss the situation, and under the direction of the War Industries Board to arrange to meet the needs of the occasion. It was desirable that action should be taken before the movement of wool began, and in some sections shearing was already under way.

### Powers of the Executive to Procure Supplies and to Regulate Prices.

By section 120 of the Act of June 3, 1916 (39 Stat. 166, 213 [Comp. St. §§ 3115f–3115h]), the President was authorized to place an order with anybody for any needed material of the sort usually produced by such person. Such an order was to be given preference over all private engagements, whether they were prior in date or not. Failure to comply with it entailed serious penalties, and moreover authorized the President to take over the plant of the recalcitrant and operate it, just compensation being, of course, made.

[1] The President, as Commander-in-Chief of the Army and the Navy, doubtless had the constitutional power in war time, in cases of immediate and pressing exigency, to appropriate private property to public uses; the government being bound to make just compensation therefor. Mitchell v. Harmony, 13 How. 115, 133, 14 L. Ed. 75; United States v. Russell, 13 Wall. 623, 20 L. Ed. 474; Roxford Knitting Mills v. Moore & Tierney, 265 F. 177, 179, 11 A. L. R. 1415. The first of the above cases shows how careful the courts are to restrict the exercise of this power within narrow bounds. Various statutes, passed during or in anticipation of our entry into the World War, expressly authorized the President to requisition sundry classes of property of which the government had need. Quotation and analysis of these various acts of Congress is not necessary to any matter now in hand. It is sufficient that in the spring of 1918 almost everybody believed that under them he could take over all or any portion of the wool in the country, if he thought that it was required for war purposes. The government, of course, was bound to pay just compensation for whatever private property it appropriated. Under most of the statutes, if the President and the owner could not agree as to what amount would be just, the United States paid him 75 per cent. of what it thought was right, and authorized him to sue it for whatever balance he claimed was still due him.

[2-4] The President was given certain powers to fix prices of various commodities, of which it does not appear that in the spring of 1918 wool was one. Whether this could be constitutionally done we need not now stop to inquire. The Supreme Court has expressly reserved the question whether Congress may lawfully authorize the President, even in war time, to fix conclusively the maximum prices at which one individual may sell to another. Matthew Addy Co. v. United States, 264 U. S. 239, 44 S. Ct. 300, 68 L. Ed. 658. It would, however, now seem clear that none of the statutes empowering the President or other executive agencies to fix prices authorized him or them finally to say what any one must take for any property of his wanted by the government for its own use. Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463; National City Bank v. United States (D. C.) 275 F. 855. The constitutional requirement that the government must pay just compensation for what it takes is one which war does not suspend. National City Bank v. United States (supra); United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045. In the absence of agreement between the owner and the government, what is just compensation is a judicial question, to be decided by the courts and not by the executive. Monongahela Navigation Co. v. United States, supra; United States v. New River Collieries (C. C. A.) 276 F. 690.

### The Conferences Between the War Industries Board and the Wool Growers and Dealers.

As has been seen, the government was legally able to commandeer the wool it needed. There were grave objections to obtaining the fleeces in that way—some administrative; others economic and political. The wool clip was in the hands of hundreds of thousands of individual owners, whose flocks numbered anywhere from three or four sheep to many thousands. It was almost impossible separately to deal with every one of them, no matter how summary were the methods of requi-

sition. To get the wool in that way would have required the organization of a staff of hundreds of men, whose services in that hour of stress were sorely needed for other tasks. Differences of opinion as to what was just compensation would have been frequent, and litigation would have followed. Much money would have been wasted and much irritation excited. For these and perhaps other reasons the War Industries Board, as well as the Army authorities, were reluctant to resort to commandeering, although for obvious reasons they did not allow either owners or dealers to forget that they could commandeer if they chose.

Their real wish was to come to some understanding as to prices with the representatives of the large and influential wool growers' associations. The spokesmen of the organizations could not legally bind their own members, to say nothing of those growers who were not on their rolls. Nevertheless it was highly probable that general and perhaps universal acquiescence would be given to any scale of prices which the delegates of these societies, without undue pressure, could be induced to accept. The gentlemen who undertook to speak for the growers made it plain that they did not welcome any fixing of prices at that time, either by government edict or voluntary agreement. They preferred to leave the matter to the unhampered interplay of supply and demand, so that the government and all other purchasers should pay, whenever they bought, whatever figure then prevailed in the market. Nevertheless the overwhelming majority of the wool growers and of those who undertook to voice their wishes were patriotic citizens and reasonable men. They wanted to help the government in its hour of difficulty, provided that they were not called upon to do more than they thought was their share. They were given full opportunity to express their views, and in the end there was little difficulty in getting them to agree that for the various grades of scoured wool at the seaboard the scale of prices prevailing at the end of the preceding July would be satisfactory. That was, however, but one of the problems to be solved. How was the government, or the manufacturers, who for the government were to turn the wool into cloth, to get it from the farms and the ranges to the mills, and how was the sum of money which each grower should receive for his fleeces to be ascertained.

Wool is of many grades, and the prices to be paid were for the scoured article of each of these several kinds. When a fleece comes off the back of a sheep, an always large but widely varying proportion of its weight is represented by worthless moisture, grease, and dirt. Their past experience had made the large majority of the growers unwilling to let the wool leave their physical possession until they knew precisely what they were to get for it in dollars and cents. As one of their spokesmen said, they were "constitutionally opposed to consigning their wool." If they would not, it was necessary that some one should inspect their unwashed fleeces and agree with every individual of them as to the grade, and as to the probable amount of scoured wool which could be obtained from those he had to sell. For much the same reasons as had made a general commandeer impractical, the government wisely shrank from an attempt to organize an independent service of its own to make these thousands of separate examinations and to strike these equally numerous bargains.

Was it necessary to do so? The wool trade was perhaps one of our oldest forms of commerce. In the much more than a century of its existence it had built up an organization which stretched from the woolen mills to every hillside upon which there was a sheep. In 1918, as in scores upon scores of years which had preceded, the wool dealers, large and small, in person or by their agents, were ready and willing to meet each individual grower and to dicker with him as to how his fleeces would grade, and how much scoured wool could be gotten out of them. With everything else the government had to do in that spring, was it worth while to scrap this smoothly operating machine, and to substitute for it something else which could not, at first, at least, work anything like so swiftly or so efficiently? Why should not the dealers collect the wool in their warehouses as they had been in the habit of doing? The government could buy it from them at the prices which, with the assent of the representatives of the growers, it had determined to be just, plus such addition as would reasonably compensate them for their trouble. The dealers were willing to do the work. They naturally wished to keep their business organizations intact and to have them actively employed, so that, when the war came to an end, they would be ready to go on as they had in the past always done. They knew what the government would pay them at the seaboard for each grade of scoured wool, and in their purchases from the growers they could govern themselves accordingly.

This solution of the problem was simple.

It satisfied the dealers, and it fully protected the interests of the government as a mere purchaser of the wool. It was, however, naturally enough, not altogether to the liking of the growers. Their comment on it to the War Industries Board was in substance: "You have asked us to agree to an arbitrary limitation of what at the seaboard you will pay or permit to be paid to the dealers for scoured wool. If we do, we will not get the figures we are persuaded an open market would give us. But you are doing nothing to make sure that we will receive all that should be coming to us, even under the prices you wish to fix. You leave each of us, however limited his knowledge of business, or of what is going on in the world, is, how unfitted he may be to cope successfully in a contest of trading wits, or how severely he may be pressed for ready money, to make his own bargain with a dealer, who is thoroughly posted and who will usually have access to ample cash. The fairest of the latter will naturally feel compelled to protect himself against the possibility of paying any of us for more scoured wool than he is sure the fleeces will yield. It is a matter in which exact certainty is not possible, so that perforce each dealer will allow himself a margin of safety, for which we will necessarily pay. The more unscrupulous of the dealers, or of their traveling men, will make use of the difficulties of the situation to drive still harder bargains with us."

The War Industries Board felt the force of these objections. They endeavored to meet them by pointing out that a grower who did not sell his wool to a dealer, but simply consigned it to him for sale, would be safe. In the absence of actual fraud, he would receive for his fleeces the exact price paid by the government or the manufacturer, less interest and freight, for the purchaser, whoever he was, would be required to pay the dealer's commission, which was fixed at 4 per cent.

It was, however, evident that the great majority of the growers were not prepared to surrender their deeply rooted objections to consigning their wool. The record in the instant case shows that only one-sixth of the wool received by the defendants was consigned to them; the other five-sixths they bought outright. The board felt that something should be done to protect those growers who preferred to sell, and it hit upon the device which has led to this litigation. It said to the growers in effect:

"It is true that each one of you who insists on selling his wool to' a cross-roads storekeeper near his farm, or to the agent of a wool dealer located in some more remote city or town, will have to make with the purchaser just such a bargain as he has always made in the past. You will be in a better position to do so than you have ever been before, for you will not have to take any chance of fluctuating markets. Even so, the dealer may allow you less for your wool than we wish you to have. We cannot give you complete protection against that possibility, but we can reduce almost to the vanishing point his temptation to take undue advantage of you. We will limit the profit he may retain for himself. We cannot do this as to each individual transaction, for our supervision cannot go so far; but we can and will fix the maximum he may retain upon his business as a whole."

"To accomplish this purpose, we will divide the purchasers of wool into two classes. One of these will be the country merchants, who drive their bargains directly with the growers, and the other will be the wool dealers in the great distributing centers, who will ordinarily buy from the rural storekeepers. We will require every purchaser of wool, no matter to which class he may belong, to make at the end of the year a detailed report of all the wool business he has done, and of his receipts and disbursements therein. If it appears that he has made, if a country merchant, a gross profit in excess of 1½ cents a pound, or if a dealer in a distributing center one greater than 5 per cent. on his season's business, we will take the overplus from him." "To make sure that these rules shall be obeyed, we will not let any one deal in wool without a permit from us."

It may be said that the board had already secured from the representative dealers, with which it conferred, an assent to the essential fairness of this plan. Of course, neither growers nor the board used the precise words we have assumed to put in their mouths; but we think the story as we have told it accurately reproduces the general effect of the stenographic report of the conferences among the members of the War Industries Board and of the discussions they had with representative growers and dealers.

The general understanding then reached does not appear to have been at the time reduced to precise and detailed written form. That task was left to the draftsmen of the "regulations," which were not issued until May 21, or more than three weeks after the conferences had come to an end. Incidentally it may be noted that they purported to be promulgated by the Wool Division of the War Industries Board, over the signature of

the chairman of that division, and not by the board as a whole.

## The Regulations.

They began with the statement that the War Industries Board had fixed the prices of the 1918 wool clip on the scoured basis at Atlantic seaboard markets at those established by valuation committees and approved by the government on July 30, 1917. A table of them was annexed.

The regulations declared that the government should have a prior right to acquire at those prices all or any portion of the 1918 wool clip which it might require. The remainder was under the direction of the War Industries Board, to be subject to allocation for civilian purposes. There followed a statement of the practical reasons why all the wool clip of the year must be so collected that it could be distributed through approved dealers in selected centers. Approved dealers were defined to be those authorized by the War Industries Board to handle wool, and who were at the distributing centers and bought from growers direct through agents or from country merchants, or who were located in wool-growing districts, and bought direct from growers for resale or consignment to the dealers in the distributing centers. It was stated that in a general way the clip might be divided into what were known as "fleece wool" and "territory wool." These differed as to trade conditions and practices, and in the opinion of the board it was expedient that there should be a variance in the regulations applied to them. We are here concerned only with such regulations as had to do with the handling of the so-called "fleece wool." Under the heading of "Compensation of Growers and Dealers" the regulations provided that "approved dealers," not located at distributing centers, should be entitled to a gross profit in no case to exceed 1½ cents per pound on their total season's business. This profit, it was stated, was to "cover all expenses from grower to loading wool on cars."

For reasons already stated, it was impossible with like precision to specify what a grower was to get. All that could be said on that subject was that he should receive "fair prices for his wool, based on the Atlantic seaboard price as established on July 30, 1917, less the profit to the dealer as stated above, and less freight to seaboard, moisture shrinkage, and interest." For further precaution it was said: "In no case shall this be construed to mean that there shall be more than 1½

cents per pound" gross profits made from time wool leaves growers' hands until it arrives at the distributing center." On consignments forwarded to distributing centers, the prices to be paid to the approved dealers were to be the Atlantic seaboard values of July 30, 1917, to which it was declared there should "be added a commission of 4 per cent., to be paid by the government" if the wool was bought by the government, or "by the manufacturer to whom the wool is allotted for other than government purposes." It was said that the commission "was to include grading and other expenses of handling." It was provided that the consignee should be charged with the freight on his shipment and interest on all advances made for his account to the date of the arrival of his wool at a distributing center." In order to encourage consignments, small growers were advised to pool their clips in quantities of not less than 16,000 pounds, so that they might ship at the lower carload rates of freight.

Under the caption "Government Price" it was provided that "approved dealers in approved distributing centers will be required to open and grade all their purchases on consignments as rapidly as possible after the arrival of wool at a point of distribution. Prices on all wools, as soon as graded, will be fixed by a government valuation committee appointed for that purpose in the different distributing centers." Those prices were of course to be those established on the 30th of the preceding July for Atlantic seaboard markets. The government was to pay in addition a further sum equal to 4 per cent. of the selling price "to cover compensation or commission to approved dealers for their services in collecting and distributing wool." For such wool as was not taken by the government, the dealer was to receive the same price and the same commission, both of which were, however, in that case to be paid by the manufacturer to whom the wool had been allocated.

Then followed the paragraphs which are the basis of this suit and of all similar actions. They are headed "Profiteering Prohibited." It will be well to quote from them with some fullness. They read: "As a guard against profiteering, the books of all approved dealers in distributing centers shall be at all times open to government inspection, and if it be found that their gross profits, including the aforesaid commission of 4 per cent., are in excess of 5 per cent. on the season's business, then those gross profits *shall be disposed of as the government decides.*" The books of the country dealers were also to be open to

government inspection. If it appeared that their gross profit from the season's business was in excess of 1½ cents per pound, then such excess *"shall be disposed of as the government* may decide." The italics in each case are ours. Baltimore was one of the nine places designated as distributing centers.

All dealers, whether at approved distributing centers or in the country districts, desiring a permit to operate, were to apply to the Wool Division of the War Industries Board. The dealers in distributing centers were to state their capacity for storing and grading; those in the wool-growing neighborhoods had merely to give their names and addresses. It was, however, provided that, in order to expedite movement of wool, a dealer of either class was authorized to operate immediately in accordance with the regulations, pending application for and granting of permit.

### The Special Facts of the Instant Case.

The defendants were wool dealers in Baltimore. They received a copy of the regulations and they applied for a permit as dealers at a distributing center. Doubtless as a result of some clerical mistake they were sent one as country dealers, and they never received any other. They are sued as dealers at a distributing center, in which capacity it is admitted the bulk of their business was done, although they also operated as country dealers. By the construction which the government subsequently put upon the regulations, the defendants are entitled to retain for themselves, in addition to the gross profit of 5 per cent., an additional gross profit of 1½ cents a pound upon such wool as they bought direct from growers, and upon which no other dealer had made profit or commission.

After the issue of the regulations and until the close of 1918, the defendants notified the government whenever they had on hand a quantity of wool which they had graded and which was ready for government inspection and valuation. The latter thereupon sent a committee to the defendants' place of business. This committee inspected the wool and put a value upon it. The government then made a written proposal to buy the number of pounds in the parcel at a named price, and the defendants signed and returned a written acceptance. The wool was delivered to the government, and the defendants were paid the price named in the proposal and acceptance and a commission of 4 per cent. thereon.

In compliance with the government's requirement, the defendants at the end of the year made a detailed report of all their purchases of wool. Among other things it showed that they had bought from several hundreds of separate sources, in amounts varying from less than 5 pounds to upwards of 60,000, and had paid therefor sums ranging from less than $3 to upwards of $43,000. In accordance with its usual practice, the government had an inspection made of the defendants' books. It is agreed that they showed that the defendants, as sellers of their own wool, had received either from the government or from manufacturers authorized to buy:

| | |
|---|---:|
| An aggregate of................ | $802,312.32 |
| And as commissions at 4 per cent. thereon ..................... | 32,092.49 |
| The total being.................. | $834,404.81 |

| | | |
|---|---:|---:|
| For this wool they had themselves paid..... | $760,295.15 | |
| For interest on such payments from time made until purchase and payment by government or manufacturers ...,......... | 3,801.48 | |
| For freight.......... | 6,480.17 | |
| A total of..................... | | 770,576.80 |

The government's contention is that the difference between defendants' receipts and expenditures as above stated or ..................... $ 63,828.10 was the defendants' "gross profits on the season's business," in the sense of that phrase as used in the regulations.

The government's view is that the "season's business, upon which the maximum gross profit of 5 per cent. was to be calculated, included nothing other than the defendants' receipts from the sale of their own wool of the clip of 1918 and from the 4 per cent. commission thereon. Their receipts from the sales of wool which had been consigned but not sold to them, or from sales of their own wool of the clip of 1917, and the commissions collected by them on such consignments and sales, were not from this standpoint a part of their season's business, and they were not entitled to any profits thereon, other than such commissions. The 5 per cent., calculated as the government says it should be on the $834,404.81 above set forth, amounts to $40,125.61. This action was accordingly brought to recover the difference between the defendants' gross profits as the government figured them and the maximum which the government says was permissible; that is to say, the suit is for $23,712.49.

A jury was waived in writing and the trial

was to the court. The facts were not in dispute. The defendants proved that in 1918 it cost them to do business upwards of $58,000 over and above the allowances for freight and interest conceded by the government, and that after deducting therefrom nearly $5,000, which they had received mainly from commissions on consigned wool, and which the government had not charged in their receipts, there still remained a net unallowed for expenditure of some $53,000. As their gross profits as the government figured them but slightly exceeded $63,000, their net earnings were only a little over $10,000. It followed that, if they are now required to pay the $23,-000 for which it asks, their net losses on their 1918 business will be upwards of $10,000.

There is no contradiction of this testimony. It is true that the government regarded it as irrelevant to any issue properly in the case, and therefore did not subject its details to close scrutiny. Still the items going to make up the total expenditures were separately given; the government had in court its accountants, who were familiar with defendants' books and knew how they had been kept. It is quite possible, nevertheless, that some of the defendants' calculations were open to criticism, but not, as we suppose, to an extent sufficient to alter the conclusion that, if the government wins its suit, it will recover from the defendants more than the net sum earned by them, and that such excess will necessarily be taken from their capital investment. Put in another way, the government is insisting that the defendants shall surrender to it, not only their entire net earnings for the year, but shall pay it $10,000 besides.

At the trial below the defendants contended that, under a proper construction of the regulations themselves, the government was not entitled to recover all or any of the sum for which it sued, and that in any event the regulations were not binding upon them, and consequently the government had no right of action. The learned trial judge summed up his conclusions in a few words, to the effect that he agreed with the government's construction of the regulations, but that he thought that, "applied to the facts of the case before him, the regulations were invalid." Judgment for the defendants followed, and the government sued out its writ of error.

Its contention here is that the regulations, by virtue of their promulgation by the Wool Section of the War Industries Board, and as it claims of their subsequent ratification by Congress, are in themselves enforceable against the defendants, and that, even if that be not so, nevertheless they formed part of a contract made by the defendants and are binding upon them. If the government can sustain either of these contentions, it is not important to inquire whether in 1918 the defendants made money or lost it.

We will consider the two grounds upon which the government rests its right of recovery in the order in which we have stated them.

Were the Regulations, as Such, Enforceable against the Defendants?

It would, we think, be difficult to hold that the regulations, when issued, were binding upon any one who had not agreed to them. The duties of the Council of National Defense and the War Industries Board were primarily those of investigation and of recommendation. They were to find out what it would be well to do, and to give the benefit of their conclusions to the other agencies of the government, particularly to those charged with making purchases for it. The power conferred upon the Council of National Defense "to make rules and regulations" was expressly limited by the addition of the words "for its work." 39 Stat. 649. It clearly did not extend to imposing restrictions upon persons not in the government employ. The War Industries Board was by the President directed to act as the "eye" of all the supply departments. He did not attempt to authorize it to legislate on such far-reaching questions as the proper place of middlemen in industry, and the limitation of the maximum profits of traders, and he could not have done so, if he would.

[5] The regulations purported to be prescribed by the Wool Division of the War Industries Board. The government asks us to assume that, as the board and its Wool Division were agencies of the President, the regulations are to be considered as issued by him. To do so might be going rather far. Undoubtedly the President cannot exercise in person and in detail all his multifarious powers. Many things which are done by his agents may properly be held to be his acts, although as a matter of fact he may know nothing of them. Does that rule of practical and necessary convenience justify the courts in holding that a citizen may be required to surrender thousands of dollars of what, except for certain regulations, would be his own, when he is not informed by the regulations themselves that they are the act of the President, or of any one else who has the right to issue them? The question is inter-

esting, but we do not find it necessary to attempt an answer to it. We have not been referred to any authority, constitutional or statutory, which in May of 1918 justified the President in requiring obedience to those portions of the regulations which are of importance in this case. The provisions of section 5 of the Lever Act (40 Stat. 276, 277 [Comp. St. § 3115⅛g]), authorizing the President to license persons as dealers in necessaries as therein defined, are inapplicable, even if their constitutionality be assumed, a question on which we intimate no opinion, because at no time before the close of the year 1918 was wool included among such necessaries. United States v. American Woolen Co. (D. C.) 265 F. 404.

### The Alleged Ratification by Congress.

[6] The President by executive order dissolved the War Industries Board as of December 31, 1918. The order transferred to the Bureau of Markets of the Department of Agriculture the powers and function of the board regarding the wool clip, "particularly those relating to the payment by the dealers or buyers of any sums due by them in accordance with" the regulations "and the disposition of such payments."

The Secretary of Agriculture subsequently asked Congress for an appropriation to enable the Bureau of Markets to do the clerical and other work necessary to the collection and distribution among the growers of such excess profits as had been made. The Agricultural Appropriation Bill for the fiscal year 1920 (Act July 24, 1919, 41 Stat. 267), as it passed the House of Representatives, contained a provision making an appropriation of $35,000 to *"enable the Bureau of Markets to complete the work of the Domestic Wool Section of the War Industries Board and to enforce the government regulations for handling the wool clip of 1918 as established by the Wool Division of said board, pursuant to the executive order dated December 31, 1918, transferring such work to such bureau.* The activities to be undertaken under this appropriation shall include the securing and auditing of the accounts and records of the dealers, the further collection of excess profits, as provided in the regulation for handling the wool clip of 1918, and so far as practicable the distribution of such excess profits to individual growers of the wool upon which such profits were made; necessary printing and publication of the results of this work, including the names and addresses of dealers who have complied and who have failed to comply with the rules and regulations for handling the wool clip of 1918." Cong. Rec., 66th Congress, 1st Session, 604. In the Senate the unitalicized sentence was stricken from the bill, on a point of order that it constituted general legislation. Cong. Rec., 66th Congress, 1st Session, 1277–1281. The House concurred in its elimination. Cong. Rec., 66th Congress, 1st Session, 1726. The language which was left in the act as it became a law was reproduced in the subsequent annual appropriation acts (Act May 31, 1920, 41 Stat. 725; Act March 3, 1921, 41 Stat. 1343; Act May 11, 1922, 42 Stat. 533; Act Feb. 26, 1923, 42 Stat. 1314; Act June 5, 1924, 43 Stat. 455; Act Feb. 10, 1925, 43 Stat. 846; Act May 11, 1926, 44 Stat. 524), except for variances in the amount of the money appropriated.

When the Appropriation Act for 1921 passed the House, the provision which had been in the preceding bills was all on that subject to be found in it. In the Senate there was added, by amendment, "and to continue as far as practicable, the distribution among the growers of the wool clip of 1918 of all sums heretofore or hereafter collected or recovered, with or without suit by the government, from all persons, firms or corporations, which handled any part of the wool clip of 1918, *which said regulations are hereby legalized, ratified and confirmed as fully to all intents and purposes as if the same had, by a prior act of Congress, been specifically authorized and directed."*

The Senate committee which recommended the adoption of this amendment in its report said: "This amendment will remove any possible doubt as to the validity of the regulation and the power to make distribution of excess profits, and will very likely result in the settlement without litigation of a number of demands now outstanding, and in those which cannot be enforced except by litigation would greatly simplify the issues." Senate Report 777, 66th Congress, 3d Session. After the usual conference on the various amendments made by the Senate, the chairman of the House conferees reported to that body, recommending that so much of the Senate amendment above quoted as we have italicized should be stricken out. He explained: "The Senate amendment undertook, not only to provide for the continuance of this work, but to legalize the regulations under which the profits were determined. The House committee felt that whatever rights the private individuals had under those regulations were determined by the regulations themselves, and

that Congress would be entirely outside its province in undertaking to establish a different liability than the regulations themselves established. Therefore the House committee agreed to the amendment tentatively, with an amendment striking out the provision which provided that legalization." Cong. Rec., 66th Congress, 3d Session, 4085, 4086. The report of the conference committee was accepted by both branches of Congress and the legalizing clause was stricken out. The portion of the Senate amendment which authorized the continuance of the distribution among the growers of the sums collected has formed a part of the subsequent appropriation bills.

[7] We may take judicial notice of this much of the legislative history of the provisions which the government claims ratified and legalized the regulations so far as Congress could do so. Duplex Printing Press Co. v. Deering, 254 U. S. 443, 474, 475, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. From what happened, it is clear that Congress was unwilling to give to the regulations any legality which they did not otherwise have. It did not wish, on the other hand, either to say or to suggest that they were not valid. In accordance with the general spirit of our institutions it preferred to leave the question to the courts, furnishing the executive, however, with sufficient money to enable it to prepare and present the government's contention to the courts, and to distribute whatever was collected among the growers, in so far as such distribution was practicable.

It is difficult to see how any other understanding can be had of what Congress did and refused to do, and certainly the courts will not strive after an interpretation which would raise difficult constitutional questions, such as whether Congress in the spring of 1918 itself could have validly done what the Wool Section of the War Industries Board attempted to do, or, assuming that Congress could then have validly done so, may it do the same thing years after the wool clip of 1918 and all dealings in it had become a thing of the past? The government cites cases to show that taxes may be retroactively levied or their illegal collection subsequently ratified, but was this demand for the surrender of excess profits a tax or did anybody ever assume it to be such? Congress had itself levied such taxes on excess profits as it thought wise. No one really suggests that the War Industries Board itself ever thought that it could supplement this legislation, or was in fact doing so.

The learned counsel for the government stresses Hamilton v. Dillin, 21 Wall. 73, 22 L.

Ed. 528, as an instance of a congressional ratification of a collection made under what it claims were circumstances similar to those before us. In that case the President and the Secretary of the Treasury, under the authority of a statute, had delegated to certain officials the issue of licenses to traders to buy cotton within the Confederate lines and bring it into the Federal, and had, as the statute expressly said they might, promulgated certain rules and regulations under which the licenses were to be issued. One of them required a licensee to pay 4 cents for each pound of cotton he brought through. Hamilton obtained a license, paid the 4 cents a pound to the proper government official, and subsequently sued to recover it back. The Supreme Court pointed out that the business in which Hamilton wished to engage was forbidden, both by the common and the statutory law, except when the government saw fit to permit it, and that the government had a right to require that assent to be paid for. The court was evidently of the opinion that the congressional grant of authority to subject the issue of licenses to rules and regulations was sufficient to justify the requirement of the fee, but in any event the plaintiff had voluntarily paid for leave to engage in a business into which, without permission, he had no right to go. Congress subsequently ratified the receipt of the money and its payment into the national treasury. The occupation in which in 1918 the defendants here were engaged was as lawful then as it always had been. This action is not brought by them to recover back money which they had paid without protest, but is instituted by the government to compel them to surrender something which they insist they have a right to retain.

## Did the Defendants Agree to Pay Over Their Excess Profits?

[8, 9] The government, nevertheless, insists that it is entitled to recover because the defendants for a valuable consideration promised to make the payment demanded of them. If such a promise was made, and its enforcement is not forbidden by some rule of public policy, it may well be held binding, whether it was or was not one which those acting for the government had a right to require. Silliman v. United States, 101 U. S. 465, 25 L. Ed. 987; American Refining & Smelting Co. v. United States, 259 U. S. 75, 42 S. Ct. 420, 66 L. Ed. 833. If there was an express contract, it would scarcely be necessary to inquire into the extent of the powers of either the Wool Section or the War Industries Board. Who suggests the form a government

contract takes is usually immaterial. As often as not, it is drawn up by some subordinate clerk or employee, who has little or no independent authority. The draftsman may be some one altogether unconnected with the government service. If the regulations formed part of an express contract between the government and the defendants, under which it paid them many hundreds of thousands of dollars for a million or more pounds of wool sold and delivered by them, it makes no difference where the regulations originated, or what was the precise legal status of the man or men who drafted them. But in this case the record does not show any express promise by the defendants either to comply with the regulations as a whole or to make the payment now demanded of them.

The government, however, contends that what they did and left undone was in legal effect the equivalent of such an express undertaking. It points out that they had received a copy of the regulations, by which it was made clear that the government had asserted a prior right to all the wool clip of 1918, and had in effect declared that none of it should be handled by any dealer who was not approved by the War Industries Board, and that it would require every approved dealer to turn over to the government whatever profits he made in excess of $1\frac{1}{2}$ cents a pound, if he was a country dealer, or 5 per cent. on his season's business, if he was a dealer at a distributing center. Nevertheless the regulations did not in terms require any assent from a dealer. They were in form neither a contract nor a proposal for one. For obvious reasons they were made to appear to be what they called themselves, "regulations" issued by competent legal authority. They assumed to be binding in virtue of their promulgation by the Wool Division, and not as a result of any assent to their terms by growers, dealers, or manufacturers. It may be open to question whether it now lies in the mouth of the government to say that it is not bound by the character it then chose to give them.

On the other hand, it is true that it never forced a permit on any one, certainly not on these defendants. Before a dealer could obtain one, he had to ask for it, although the record before us suggests that his failure to obtain it would perhaps have made little difference. The larger part of defendants' business was done as dealers in a distributing center. Indeed, the government says that all of it was. Yet they never had any permit as such. They asked for one, but, as has been already stated, all that was ever sent them

was a permit to act as country dealers. Upon these facts it would be difficult to base a finding that they had agreed to pay over to the government all the profits in excess of 5 per cent. they might make as dealers at a distributing center. It may be said in passing that in most, if not all, of the reported cases the questions ruled upon arose on demurrer to declarations or complaints in which the government alleged that the defendants therein had agreed to pay over what was demanded of them, and the decisions were that a good cause of action was stated. In the instant case the government made a like allegation and contends that, in spite of what has already been said, the evidence sustains it. It urges that the regulations told the defendants (a) that it was the expectation of the Wool Section of the War Industries Board that the defendants would surrender their excess profits; and that (b) the defendants would not be allowed to continue in business, had not the Wool Section supposed that they would in fact do so.

To this contention the defendants in effect reply: "We were dealers in wool years before there was a Council of National Defense, a War Industries Board, or a Wool Section. When we entered into the business, we did not ask leave from the government, and we could not have been required to do so. In that respect the year 1918 was like all other years. We went into the business originally because it so pleased us, and in 1918 we remained in it for the same reason. Our right to choose our own way of earning our bread had never been lawfully taken from us. Any one who called on us to abandon it must show his right to require us to do so. We were under no obligation to challenge any claim of authority, or of purpose to put us out of it, until some actual step to force us to give it up was taken. When the Wool Section told us, as you say that it did, that we must stop unless we agreed to go on subject to the regulations, we were not called upon to answer, or to engage in any controversy with it. The very cases, such as the American Refining & Smelting Co. v. United States, supra, which you cite against us, in substance rule that, when a government official makes an unjustified demand upon a citizen, the latter should continue to act as if it never had been made."

The defendants say that they had no objection to selling their wool to the government at the prices prevailing on July 30, 1917, plus a commission of 4 per cent. and that they were perfectly willing, after the

year was over, to report to the Wool Section all their purchases of wool and what they had paid for each lot they had bought. These things they did, but they argue that the doing of them does not imply an agreement by them to surrender their profits in excess of 5 per cent.

[10] The difference of view raises interesting questions, but some things would seem to be sufficiently clear. The mere fact that, after the close of the season's business, the defendants made such a report as the regulations required, will not estop them from saying that they are not bound by other provisions in those same regulations. The submission of such a report did not lead the government to change its position, or to do or to leave undone anything it would otherwise have done or refrained from doing. Very much the same may be said of the defendants' many offerings of wool to the government, or to manufacturers designated by the government. Any one had the right to do that. The government, without admitting the soundness of such reasoning, says that the defendants, by taking the 4 per cent. commission which it asserts they knew would n t have been paid to any dealer whom it did not believe to have undertaken to abide by the regulations, must in all fairness be held to have agreed to be bound by them.

This contention would be more persuasive if the government had employed the defendants to buy wool for it. If their relation to the government had been that of servant or agent, there might well have been an agreement limiting the profit which they might retain for themselves. Such an agreement might have been reasonably implied from the sending by the government to them of a copy of the regulations, and their retention of such copy without protest or objection. It is, however, plain that the defendants had no reason to suppose that the government wished to make them either its servants or its agents. Indeed, they had strong grounds for thinking that it did not. For reasons of its own the government was, as we have seen, at some pains to give to every procurement of wool from the defendants the form of a separate and distinct purchase by it from them of a definite quantity, of a specified grade, at a named price. Moreover, in the figuring of the 5 per cent. gross profits, the government even now makes a distinction between the sales of consigned wool and of wool of which the defendants were the owners. Whenever a proposal was made for a particular lot of their wool, the defendants, it is true, knew that 4 per cent. would be added to it and would be called commission; but in determining whether they would or would not accept the offer, they were justified in considering this 4 per cent. as part of the total price offered them.

To hold that under such circumstances the mere acceptance of this added 4 per cent., no matter what you call it, amounted to an agreement to comply with those other provisions of the regulations which called upon them to surrender their gross profits from their season's business in excess of 5 per cent., would be going farther than we think we would be justified in doing. As already stated, for reasons of its own, the government preferred to make each purchase of wool a separate transaction. There was first an inspection of each particular lot by the government, a written offer for it, and a written acceptance of that offer by the defendants. In some of the cases which the government has brought to our attention as sustaining its position, it appears that there was not a little reason to suppose that the government was commandeering; but, when the owners of the property acquiesced in giving to the transaction the form of a sale, they would not afterwards be heard to say that it was not. The same rule is perhaps not altogether inapplicable to the government.

In the case before us the evidence does not, in our view, sustain the allegation of the government that the defendants agreed to do what the government in this action seeks to compel them to do, unless that agreement can be implied from their continuing in the wool business with the knowledge they had of the wishes and expectations of the Wool Section, and from the good reason they had to believe that, if they let the section know that they did not intend to pay over their excess profits, the government would have taken such steps whether legally sustainable or not as would in effect have put them out of business, the condition of the country, of the world, and of American public opinion being what they were.

[11] It may well be true that the government is right in asserting that consequences unpleasant to the defendants would have followed an announcement by them that they did not propose to pay over their excess profits; but were they under any obligation to make such announcement? As has already been intimated, we do not draw from the cases upon which the government relies the conclusion it reaches. To us they seem to say that the private citizen may and should assume that government officials and boards, no matter what they may say, will not in fact

attempt what they have no right to do. The instant case is not one in which the defendants would have been justified in seeking injunctive relief against a merely threatened refusal to permit them to continue in business. Their remedy at law was adequate. They might continue in business as they always had, and set up their defense when, if ever, the government brought an action against them for the excess profits it claimed. That is precisely what they are now doing.

Of course, what has been said assumes that neither the Wool Section nor the War Industries Board had any legal right to put the defendants out of business. If their right to continue their occupation was lawfully dependent upon the action or nonaction of those organizations, or either of them, then it is possible that the silence of the defendants and their remaining in business might be held to amount to a promise that they would comply with the terms which had been made a condition of their following their accustomed occupation; but, as we have already stated, we find no warrant for holding that the defendants' right to earn their livelihood as wool dealers depended upon the grace or favor of the War Industries Board or of its Wool Section.

### Is the Government the Proper Party to Sue?

The defendants say that, if they owe anything to anybody, it is not to the government, and that consequently the government is not the proper party to sue them. The government does not claim that it ever paid them a penny more than it should have done. It inspected the fleeces they had for sale, put its own value upon them and offered its price for them. The defendants did nothing more than to accept what the government proposed they should take. There is no suggestion that the figure offered was inflated as a result of any fraud or mistake upon the part of any one. The government has itself recognized that it has no just right to retain for itself as purchaser any sum it may recover. It had publicly told the wool growers, as well as the wool dealers, that it would at the seaboard pay for wool the prices of July 30, 1917. It does not claim that it paid more. If it gets back from the dealers for its own use any part of the sums it paid them, it will in the end have given less for the wool than it promised. If there is any real claim by anybody against the defendants, it must rest upon the fact that they paid some of the growers less than such growers were entitled to demand from them. If so, the defendants argue that the suits must be brought by the growers as individuals, and not by the government.

There is more in this objection than a mere insistence upon the observance of a technically correct practice. If a grower brought an action against the defendants, what could he allege? There is no doubt that he sold his wool to them, and received from them its agreed price. If they now owe him anything, it must be on the theory that they procured his assent to the bargain by some actionable fraud or misrepresentation, and yet in the present proceedings there is no suggestion that anything of the kind occurred. Moreover, the court below would have had no jurisdiction over most of the suits had they been brought by the several growers, for in none of the cases would there have been more than $3,000 in controversy. We note these contentions without passing upon them. We shall assume, without deciding, that, if the defendants are liable at all, the government may maintain the action, either in its own right or as trustee or quasi trustee for the growers. The questions which the defendants raise in this connection suggest, however, the more fundamental inquiry as to what is the nature of the obligation to enforce which the suit has been brought.

### Is the Government Seeking to Recover a Penalty?

The regulations do not say what the government will do with any excess profits it receives. They give no hint as to what disposition will be made of them. Such silence was not the result of haste or oversight. It was deliberate. Nothing was said, because nobody knew what could be said. If we may accept what was stated by the learned counsel for the government in his oral argument before us, no one has even yet been able to devise an equitable scheme for the distribution of such excess profits as may come into the hands of the government. It takes but a moment's thought to appreciate how difficult and perhaps insoluble the problem is. As already pointed out, the government cannot retain, at least as a buyer of wool, the money, without breach of faith. If recoverable at all, it will belong to some of the growers; but to whom among them, and in what proportions? If the dealers made excess profits, how did they do it? What happened was what everybody always knew was bound to happen. The dealers, in their dickerings with the growers, sought to protect themselves against the possibility or certainty that the government inspectors would not

always agree with the growers or with them as to the amount of discount in weight properly allowable for moisture, dirt, and grease. Necessarily the result was that sometimes they paid a grower proportionately less than they subsequently received from the government. There was no uniformity in the matter, and in the nature of things could not be.

In some cases, the dealers doubtless paid materially less than the fleeces turned out to be worth. In other cases, the allowances they made proved to be substantially accurate. In occasional instances, it is probable that growers received more than they should. Still the steady pressure of self-interest, always warning a dealer that he must play for safety, led him in his bargaining with the individual growers, in the majority of cases, to insist on an allowance somewhat larger than in the end proved requisite. But, as already said, the extent of this departure from accuracy must have varied within a considerable range. No one can now tell how much of the excess profits made by any particular dealer came from the various individual growers from whom he bought wool. If the knot be cut by making the distribution pro rata among the growers and country dealers, and the government should recover from the defendants in this action the $23,000 it asks from them, it will pay each of those who sold wool to them sums varying from a minimum of about 9 cents to a maximum of about $1,300. The larger sums will usually go to country dealers, and may, and often will, swell their gross profits to an amount in excess of 1½ cents per pound, and that excess will in turn have to be distributed among the growers from whom they bought.

It is now more than eight years since the wool clip of 1918 was sheared and sold. In the interval many growers have died, become bankrupts, dissolved partnerships, or have changed their residences, without leaving behind them a record of their new addresses. In 1918 no exceptional foresight was required to perceive that difficulties of the nature of those described would actually arise, and that the excess profits to be obtained from dealers could not be so returned to the growers as to do justice among them, or to prove of any material benefit to any of them. The provision for return was clearly made, not because the return in itself would do anybody any good, but because to require it would tend to prevent the accumulation of such profits in any relatively great amount.

The "regulations" themselves leave no doubt as to the purpose, and the only purpose, of the requirement that excess profits should be surrendered. The paragraphs in which it appeared are headed "Profiteering Prohibited." That was a prohibition which the War Industries Board and almost everybody else at that time was anxious to impose. Congress doubtless would have been glad to have done anything it could in that direction, but, after considering the problem from many standpoints, it reached the conclusion that all that it could do was to impose a tax of 80 per cent. upon them. In practice, even that device did not accomplish all that was hoped from it. The national legislature, of course, expected that such executive agencies as the War Industries Board would manage the government purchases in such manner as to eliminate so far as was practicable the opportunities for profiteering; but it would doubtless have been considerably surprised to learn that it had empowered such a body to deal legislatively with a problem which was essentially for its own consideration and action, and as to which it had decided that, except for the levying of the tax, anything it could attempt was likely to do more harm than good.

The solution which the Wool Section adopted was the imposing upon the dealers an obligation to surrender any excess profits they made. This surrender was not to return to the government anything which belonged to it. As we have seen, the government never paid the dealers a penny more than it had obligated itself, not only to them, but to the growers, to pay. It was not to give back anything which they had by fraud or misrepresentation taken from the growers. There was little or no claim that the money they were required to surrender ever could be equitably distributed, so as to make good to the growers that which it was hoped they would get, but which they did not receive. Their failure to do so was, however, the inevitable and anticipated consequence of the workings of the only way in which the War Industries Board and its Wool Section supposed the business could be handled.

The money which the regulations required to be surrendered was not to be paid as damages, liquidated or other; for the government had suffered none, and it did not in the regulations promise to pay over what it received to the growers, and, as we have seen, it could not as a practical matter so distribute it among them as to make good any loss they had suffered, if, indeed, it could be truthfully said that they had been damaged at all, when they received the full price which, without being misled by fraud or misrepresentation, they had agreed to accept.

[12-14] Is it not clear that the regulations in effect say to the dealers: Buy the wool from the growers, as you always have done; treat them fairly; give them as much as you safely can, knowing what we will pay for the various grades of scoured wool; so conduct your business that you will get as gross profits only 1 per cent. in excess of the commission we allow you, for after all that is all that we will suffer you to retain? If you get more, we will take the excess from you, and do with it what we think best. In short, the requirement to surrender is a sanction by which the War Industries Board and its Wool Section hoped to enforce its prohibition against profiteering; that is to say, it was in the nature of a penalty. It is true that, like many other unquestioned penalties, it was to be recovered by civil suit, and not by indictment or information; but it may be a penalty all the same. If that is its real nature, there is no question that on that ground alone, to say nothing of the others already set forth, the learned court below was right in holding that, as applied to the facts of the case before us, the regulations are invalid. The power of the War Industries Board did not extend to the imposition of penalties for the violation of the regulations it might make, no matter how wise they may have been. If the requirement to surrender excess profits was in the nature of a penalty, it would have been immaterial that the defendants had agreed that it should be imposed. One cannot by agreement subject himself to the payment of a penalty for something which he may hereafter do. Moreover, it is clear that Congress may not ratify the imposition of a penalty, after the act to be penalized has been committed.

### The Conclusion.

In the spring of 1918 much had to be hastily done. Government officials and agencies were faced with new and difficult problems. They had to reach some sort of solution of them almost overnight. In that hour of the world's agony, results had to be speedily attained. No one had then time to go into a minute consideration of the possible limits of statutory, or even perhaps of constitutional, authority. Much was done by servants of the government which went beyond the letter of any powers they had. For the most part, as in this case, everybody acquiesced in whatever seemed best to those charged with the immediate responsibility of action. When growers, dealers, and manufacturers accepted the scale of prices dictated by the War Industries Board, it is immaterial whether the board had or had not any legal power to fix them.

It is also true that, although we have felt constrained to hold that upon this record the sanction which the Wool Section sought to attach to its prohibition of profiteering is unenforceable, the regulations and the course of dealings prescribed by the section in practice seem to have reduced profiteering to almost negligible proportions. Presumably some 120,000,000 pounds of scoured wool were bought and sold in the manner the regulations prescribed. From the scale of prices forming part of them, it would seem that the aggregate amount paid for this wool could not well have been less than $150,000,000. The Secretary of Agriculture estimates the amount of profits earned by the dealers in excess of that to which the regulations purported to limit them as somewhere between $1,000,000 and $2,000,000, or say about 1 per cent. of the value of the wool dealt in.

The members of the Wool Section were not, we assume, lawyers. They may not have accurately measured the limit of their powers; but they apparently were eminently successful in accomplishing the task imposed upon them. The scheme they devised in substance achieved all they hoped from it. To enforce the portions of it which have been disobeyed would do little good to any one, and in our view would violate established legal principles, which may not be safely ignored.

In the view we have taken of the case, it is unnecessary to consider the government's construction of the regulations as to how gross profits should be ascertained, as to what constituted the season's business or upon whom was the burden of proof that the defendants were or were not entitled on any particular lot of wool to both 1½ cents a pound as country dealers and 5 per cent. as dealers in a distributing center, and we intimate no opinion upon any of these questions.

It suffices that the judgment below was right, and must be affirmed.