## UNITED STATES v. AVERY.

District Court, N. D. New York. November 22, 1927.

Oliver D. Burden, U. S. Atty., of Syracuse, N. Y., and J. S. Bohannan, Asst. Sol. U. S. Department of Agriculture, of Washington, D. C.

Sherman L. Whipple, of Boston, Mass., and Miller & Hubbell, of Utica, N. Y. (Dwight C. Pitcher, of Utica, N. Y., and Lothrop Withington, of Boston, Mass., of counsel), for defendant.

COOPER, District Judge. This is another one of the many suits which have been brought by the government to recover from wool dealers gross profits claimed to have been made in the year 1918 in excess of maximum permitted by regulations promulgated by the Wool Division of the War Industries Board for handling the wool during 1918. Decisions upon demurrer or other preliminary matter in several of these cases have been reported, but there is only one case which deals after a trial with most of many questions which have arisen in these cases. That is U. S. v. McFarland et al. (C. C. A.) 15 F.(2d) 823. Writ of certiorari in this case, previously granted by the United States Supreme Court (273 U. S. 688, 47 S. Ct. 449, 71 L. Ed. 841), was revoked on October 17, 1927 (275 U. S. 485, 48 S. Ct. 27, 72 L. Ed. 386), with the following statement:

"Per Curiam. The decision of this case does not require a decision of the questions which are presented in the petition for certiorari because of which the writ was granted, and the certiorari heretofore granted in this case is therefore revoked upon the authority of Southern Power Co. v. North Carolina Service Co., 263 U. S. 508 [44 S. Ct. 164, 68 L. Ed. 413]."

The McFarland Case in an elaborate opinion reviews at length the conditions which led up to the issuance of the regulations in question and discusses their scope and legal effect. This case will be more fully referred to later herein.

It will be sufficient for the purposes of this case to set forth only brief extracts from the regulations.

After defining approved dealers as "those dealers authorized by the War Industries Board to handle wool, who are located in the distributing centers and who buy from growers direct, through agents, or from country merchants, and also those dealers authorized by the War Industries Board who are located in wool-growing districts, and who buy direct from growers and resell, or consign to the dealers in distributing centers," and detailing the prior right, desires, and needs of the government in connection with the 1918 wool clip, the regulations provide as to country dealers under the heading of "Compensation of Growers and Dealers" as follows:

"Approved dealers shall be entitled to a gross profit in no case to exceed 1½ cents per pound on the total seasons' business, this profit to cover all expenses from grower to loading wool on board cars.

"The grower shall receive fair prices for his wool based on the Atlantic Seaboard price as established on July 30, 1917, less the profit to the dealer, as stated above, and less freight to seaboard, moisture, shrinkage and interest.

"In no case shall this be construed to mean that there shall be more than 1½ cents gross profit made from the time the wool leaves growers hands until it arrives at the distributing center."

Under the head "Government Price" the regulations provide that approved dealers in distributing centers (central dealers) will be required to open and grade their purchases; that prices will be fixed by government valuation committee appointed for that purpose, based on seaboard prices on July 30, 1917; and that central dealers will be entitled to a commission or compensation of 4 per cent. of the selling price.

The title "Profiteering Prohibited" is the particular one under which this action is brought, and reads in full as follows:

"As a guard against profiteering, the books of all approved dealers in distributing centers shall be at all times open to government inspection, and if it be found that their gross profits, including the aforesaid commission of 4 per cent., are in excess of 5 per cent. on the season's business then such gross profits shall be disposed of as the gov-

ernment decides. The books of the country dealer shall likewise be open for government inspection. It if be found that the gross profits for the season's business is in excess of 1½ cents per pound, then such excess profits shall be disposed of as the government may decide."

The record here discloses that the defendant had operated as a wool dealer in Syracuse many years. He bought wools called fleece wools from growers and others dealers in New York state and Northern Pennsylvania. The so-called fleece wools consisted of small lots of wools grown by the farmers, and were within the regulations. In order to obtain these wools the defendant employed purchasing agents in the various country districts to negotiate the purchase of the wool and to collect and store it until a sufficient amount was collected to warrant a shipment to Syracuse.

This method, followed in previous years, the defendant followed in January, March, April, and the early part of May, 1918, and paid his purchasing agents, in addition to the expense of storing and collecting the wool, a commission of 2 cents per pound on all wool purchased by them. Prior to May 21, 1918, the day the regulations were promulgated, the defendant had purchased approximately 141,000 pounds of wool of the 1918 clip, which on that day had a market value of approximately $7,000 more than he actually received for it when it was subsequently sold.

The defendant's expenses from the purchase of the wool to the time it was loaded on board cars for Syracuse was about 2¾ cents per pound, these expenses being made up largely of commission to purchasing agents, cost of storage in country districts, insurance, cost of bagging and baling, trucking expenses to warehouses and from warehouses to the cars on which it was loaded for shipment to Syracuse.

The defendant sought to be granted a permit as a central dealer, not as a country dealer. On the 29th of May, 1918, he received a permit to act as a country dealer only, and on the same day signed the agreement to abide by the regulations as such country dealer. The permit reads as follows:

"Washington, D. C., May 24, 1918.

"War Industries Board, Wool Division.

Permit to Operate.

"Permission is hereby granted to S. E. Avery, Syracuse, N. Y., to operate as an approved wool dealer in country districts, for the 1918 clip in conformity with the regulations of the War Industries Board. Louis Penwell, Chief of Wool Division, War Industries Board."

The signed agreement reads as follows:

"I, the undersigned, having received from the Wool Division of the War Industries Board a permit to operate as an approved wool dealer in country districts, do hereby agree to operate subject to the rules heretofore adopted or to be adopted by said Board for the handling of fleece wools.

"My permit is subject to immediate revocation for failure to comply with said regulations.

"S. E. Avery."

But defendant soon realized that this was not the permit as a central dealer that he wanted, and which he asserted he had been led to believe he might obtain. He believed he could not operate as a country dealer successfully or at a profit. Thereupon the following telegraphic correspondence took place between the defendant and the head of the Wool Division:

On June 3, 1918, the defendant sent Louis Penwell, Chief of the Wool Division of the War Industries Board, a telegram reading as follows:

"Louis Penwell, Chief of Wool Division, War Industries Board. Country dealers whom I have bought of for years and shipped direct to mills dislike to buy and ship to Boston or Philadelphia. Will you consider making me distributing dealer in Syracuse or Rochester. Have floor space two hundred thousand pounds.

"S. E. Avery."

On June 4, 1918, he received the following telegram from Penwell:

"Mr. S. E. Avery, 234 West Willow St., Syracuse, N. Y. Telegram received. While we cannot make Syracuse a distributing center we will permit you to accumulate wool at Syracuse and buy from Country dealers. Quartermaster's Department will agree to take your collection at Syracuse on basis of Seaboard Value. Louis Penwell, Chief of Wool Division, War Industries Board."

Thereupon defendant sent the following telegram, inquiring if such buying and shipping would carry four per cent. commission. The telegram was as follows:

"1918, June 6, 6 A. M.

"Louis Penwell, Chief of War Industrial Board, Wool Division, Washington, D. C. Extend thanks for permission to buy of deal-

ers D. L. stopped in Syracuse carry four per cent. commission, if not I would not do as well as to ship east. A mill is buying of dealers a large line of wool. Can my mills get a permit to buy of one.

"S. E. Avery."

In reply Penwell sent a telegram saying that he would allow 4 per cent. commission, but no mills could buy wool directly of any dealer. This telegram is as follows:

"S. E. Avery, 224 East Willow Street, Syracuse, N. Y. Telegram 5th received. You are allowed four per cent. commission to cover usual duties of dealers in concentration points. Mills are not allowed to buy of any dealers. Wools will be allotted them by Quartermaster Department. Louis Penwell, Chief of Wool Division, War Industries Board."

From the foregoing it is a reasonable inference that the defendant found that the regulations of the Wool Division of the War Industries Board would not work out in such a way that he could be of any service as a country dealer. He had been a buyer of wool direct from his customers in the past, and he found that the growers and country dealers with whom he dealt did not like to consign the wool to him, or to some central dealer in Boston or Philadelphia or other distributing center, whom they did not know. The wool was classified and valued at these centers, and the growers were without any guaranty that the wool would be bought by the government, for the wool had to be approved as to quality before the Quartermaster General would pay for it. There was considerable objection on the part of the growers and small country dealers generally to consigning their wool to be classified by strangers and the price fixed on the basis of such classification.

Accordingly defendant sent the telegram of June 3d, informing the head of the Wool Division that he could not successfully operate as a country dealer, and asking if he could not be made a central dealer, with Syracuse or Rochester as a distributing center. He was refused the right to operate as a central dealer with Syracuse as a distributing center, and was merely granted the right to buy from growers and country dealers and collect the wool at Syracuse. It was agreed that the Quartermaster General would take his wool at the established prices, of course, only such wool as met the requirements, and he was to be paid 4 per cent. on the selling price, which was the same commission allowed the central dealer.

After the receipt of the telegram of June 7th from the Chief of the Wool Division, informing defendant that he would be allowed 4 per cent. commission for his services in collecting and shipping the wool as directed, the defendant proceeded to act under the arrangement evidenced by these telegrams. He bought and collected the wool at Syracuse, and paid for it with his own money and with borrowed money, on which he paid interest. He paid various incidental expenses, such as insurance, baling, cartage, freight, sorting or classifying, rebaling, etc. He was paid by the government 4 per cent. on the selling price fixed by the government as compensation for his services and such expenses, but only on wool sold to the government.

At some time between May 1, 1918, and May 29, 1918, the date defendant signed the agreement, the defendant sold to Jeremiah Williams and J. Bateman & Co., 114,976 pounds out of the aforesaid 141,000 pounds purchased before the promulgation of the regulations, and upon the total sale of this wool and the remainder of the 141,000 pounds the defendant had an actual loss of $51.

Prior and subsequent to the telegraphic arrangement, but nearly all prior, the defendant sold to persons other than the representatives of the government 159,466 pounds of wool for $113,426.42, which, of course, includes the above sales to Williams and Bateman. This amount of 159,466 pounds is the net amount sold out of a total amount of 164,900, all of which was purchased for the sum of $113,370.82, prior to the telegraphic arrangement, as nearly as can be ascertained, and includes the aforesaid 141,000 pounds. The difference between the amount purchased and the amount sold represents shrinkage, unsalable wool, etc.

The above amount of $113,426.42 paid persons from whom defendant bought this wool did not include any agent's commissions, trucking, storage, baling, or any of the other expenses above enumerated, excepting possibly freight, and the difference between the moneys paid by the defendant to the sellers and the amount received by the defendant from purchases from him was $55.60. To this is added the item of $13 for "sack items not allowed," making a total of $68.60 gross profits, so called, on the sale of this large quantity of wool.

The government does not contend that defendant Avery made an actual profit on these transactions. The government contends that the defendant was a country dealer as to all wool sold by him to others than the government, whenever such wool was bought or sold, including the above 141,000 pounds,

and was bound by the country dealers' profit limitation; that he was a central dealer as to sales to the government, all of which were after June 7, and bound by central dealers' profit limitation.

The government applies the regulations to the defendant's entire season's business, including the 141,000 pounds of wool bought by him before the promulgation of the regulations of May 21, 1918, and claims that, giving the defendant the benefit, not only of the 5 per cent. gross profit as a central dealer (made up of 4 per cent. of selling price as commission and 1 per cent. additional) and of the 1½ cents per pound on wool dealt in by defendant as a country dealer (less such money, not exceeding 1½ cents per pound, as was paid and allowed to persons from whom defendant Avery bought wool), the government is entitled, under the regulations, to recover from the defendant the sum of $5,517. The government arrives at this result by this method:

Purchases.

| | | |
|---|---|---|
| Total pounds purchased | 580,583 | |
| Total price paid growers and dealers | | $402,147 54 |

Sales.

| | | |
|---|---|---|
| Total pounds sold by defendant as country dealer only | 159,466 | |
| Total money received therefor | | 113,426 42 |
| Total pounds sold by defendant as both country and central dealer | 414,095 | |
| Total money received therefor | | 307,024 97 |
| Total sales | 573,561 | $420,451 39 |
| Total gross profits | | $ 18,303 85 |

Allowances under Regulations.

| | |
|---|---|
| Country dealer profits of 1½ cents per pound on wools bought from growers and other country dealers who had made no profit | $4,755 13 |
| Margin between 1½ cents per pound and the profits of less than that amount made by other country dealers from whom defendant purchased | 9 78 |
| Total allowance country dealer profits | $ 4,764 91 |

Total allowable central dealer profits:

| | |
|---|---|
| 1 per cent. of $307,024.97 | $ 3,070 25 |
| Total Allowable freight | 2,235 37 |
| Total Allowable interest | 2,715 57 |
| Total allowable deductions | $12,786 10 |
| Excess profits | $ 5,517 75 |

The 4 per cent. commission, being 4 per cent. out of the allowable gross profit of 5 per cent., which defendant received on the sale of $307,024.97 worth of wool, does not enter into either the purchase price or the selling price in the above figures. The purchase price of $402,147.54 is the money actually paid the sellers of the wool, and does not include any expenses of commissions, cartage, sorting, handling, interest, etc.

The defendant contends, among other things:

(a) That the action cannot be maintained, because the recovery is not to go to the government, but to various unknown and unascertainable persons.

(b) That the regulations are invalid, at least so far as supporting any claim for the payment of excess profits over 4 per cent. for central dealer and 1½ cents per pound for country dealer.

(c) That, even if valid, defendant is not bound by the excess profits provision of the regulations.

(d) That, even if bound, after signing the agreement on May 29, 1918, to operate as a country dealer under the regulations, he was not bound as to any purchase made before that date.

(e) That he did not in fact operate as a country dealer, but operated under a special arrangement evidenced by the telegrams, and made no agreement to account for and was not liable for any excess profits as limited in the regulations.

(f) That he made no actual profits of any kind and paid income tax for the year on his income from all sources.

(g) That, even if bound by the excess profits provisions of the regulations as to all dealings in 1918, a correct application of the regulations shows no excess profits for which defendant is liable.

It may aid the understanding of this case if there be a division of the time and the wool covered by this litigation into three periods:

(1) The period before May 29, 1918, the day defendant signed the agreement to operate as a country dealer under the regulations.

(2) The period between May 29, 1918, and June 7, the completion of the telegraphic arrangement.

(3) The period after June 7, 1918.

During the first period, and indeed prior to May 21, 1918, the date of the promulgation of the regulations, 141,000 pounds of wool was purchased by the defendant, which had a market value of about $7,000 more than defendant actually received for it in subsequent sales. There were apparently no purchases and no sales between May 21 and May 29. None of this 141,000 pounds of wool was sold to the government, but all of it and some later bought was sold to mills direct, and no question was made of the right to make such a sale. There was an actual loss on the sale of this 141,000 pounds.

So far as his purchases prior to the signing of the agreement of May 29, 1918, are concerned, the language of the agreement would not suggest in any way that it was to have a retroactive effect, but rather that it

was to be effective from and after the signature of the agreement. Certainly that is a fair and reasonable inference from the face of the agreement. It reads:

"I, the undersigned, having received * * * a permit to operate as an approved wool dealer in the country districts, hereby agree to operate subject to the rules. * * *"

The wool which the defendant Avery had bought prior to the signing of the regulations had cost him 2¾ cents per pound more than the purchase price, for commissions and the other expenses above stated. The regulations permitted him a gross profit over the actual purchase price of only 1½ cents. To have been permitted to charge only 1½ cents per pound under the regulations would have entailed a loss upon Avery of 1¼ cents per pound.

Of the 141,000 pounds purchased before he signed the agreement, the loss of this 1¼ cents per pound would have meant a loss of $1,780, to say nothing of the possibility of loss arising from sales at less than the purchase price. The facts do not warrant a reasonable inference that there was any understanding or undertaking or intention on the part of defendant that the regulations applied to this 141,000 pounds of wool purchased before the promulgation of the regulations, nor does the language warrant that inference. The reasonable interpretation is that the agreement to operate as a country dealer was effective only as to future dealings in wool. This has some support in a decision determining whether or not the Lever Act (40 Stat. 276) applied to past purchases, even where the act seemed to expressly so declare. Addy Co. v. U. S., 264 U. S. 239, 44 S. Ct. 300, 68 L. Ed. 658.

During the second period it cannot be determined clearly what dealings occurred. While some wool was bought during this period, the defendant apparently did not make any sales until after June 7, 1918, when he was empowered to act under the telegraphic arrangement above shown. It is, however, reasonably clear that the gross profits made by the defendant on all his wool dealings for both the first and second periods (that is, all sales before June 7th, and all sales after June 7th to others than the government of wool bought before June 7th) were but $68.60, which was far less than the 1½ cents per pound country dealer's profit on the wool dealt in, in which capacity as a country dealer the government has elected to treat him.

So that, if it be assumed that his agreement of May 29, 1918, to operate as a country dealer not only covered such purchases as were made in the second period and sold at any time to others than the government, but was also retroactive and included the wool (141,000 pounds) bought by him before the promulgation of the regulations; his gross profits on all such wool was only $68.60, a sum far less than 1½ cents per pound. If the government contends that he should pay this $68.60 as gross profits in excess of the 1½ cents per pound, because dealers from whom defendant bought this wool had been allowed the 1½ cents per pound as gross profit, and such allowance of 1½ cents per pound could not twice be made, it is sufficient to say that in the government's own computation, above shown, it has allowed the defendant 1½ cents per pound gross profits, amounting to $4,754, as a country dealer, on 317,010 pounds, which 317,010 pounds includes the 141,000 bought before the promulgation of the regulations, and all other wool bought in the first and second period and sold to others than the Government. So the government cannot well contend that there is any double allowance of gross profits of 1½ cents per pound on the wool sold at a gross profit of $68.60. Nor can the government well contend that, viewing the first two periods by themselves and the defendant as a country dealer only, in which capacity the government classes defendant, it is entitled to any recovery.

The third period begins with the completion of the telegraphic arrangement. It was during this period, after June 7th, that all sales to the Quartermaster General were made. 414,095 pounds of wool were sold to the Quartermaster General at the government fixed price for $307,024.97. This includes some wool bought during the second period. The defendant's profits were made during this period, and were made on wool sold to the government under the telegraphic arrangements. There were also one or two small sales of black or rejected wool to a mill at an actual loss.

The effect of this telegraphic correspondence was to change the status of the defendant. He in substance surrendered the permit to act as country dealer without ever having had any substantial dealings as such, and thereafter operated under the new arrangement set forth in the telegraphic correspondence. All the wool thereafter purchased by defendant was collected at his warehouse at Syracuse. The agreement on its face falls under neither the classification of country dealer nor central dealer. He

was expressly informed by the head of the Wool Division that they would not make Syracuse a distributing center, but that the Wool Division would permit the defendant to accumulate wool at Syracuse from country dealers, and the government authorities would agree to take his wool collected at Syracuse on the basis of seaboard values. The Wool Division also agreed that the Quartermaster General would pay him 4 per cent. commission to cover "the usual duties of dealers in concentration points." Defendant received no formal permit to act as a central dealer.

Even if this telegraphic correspondence can be construed as a permit to act as a central dealer, the defendant signed no agreement to operate as a central dealer under the regulations. It is this absence of a signed agreement which brings his operations during the third period, after June 7th, within the decision in the McFarland Case. In that case the defendants received a permit to act as country dealers, but not as central dealers. They signed no agreement to operate under the regulations as either country dealers or central dealers. The court in that case held that the defendants acted only as central dealers at a distribution point, and that, since they had signed no agreement to operate as such, they were not liable for excess gross profits provided in the regulations for central dealers.

■ Operating generally as central dealers, accepting the 4 per cent. commission on the sale price, making the required reports and generally doing the things as central dealers required by the regulations, was held in the McFarland Case not to be equivalent to an agreement to comply as a central dealer with the regulations, nor to estop the defendants in that case from refusing to comply with the excess profits provisions of these regulations. The defendant here did nothing more in the way of compliance with the regulations than was done in the McFarland Case. This court is persuaded that the reasoning in the McFarland Case in these respects is sound and should be followed here.

■ This court also agrees with the court in the McFarland Case that the requirement in the regulations for the surrender by the wool dealer of the excess over 5 per cent. gross profits in the case of the central dealer and over 1½ cents per pound in the case of the country dealer is a penalty, and that the executive department of the government has no power to impose such a penalty. The legislative branch did not impose this penalty, nor did it delegate to the executive department, or any officer, body, or commission thereof, power to impose the penalty, and it may well be doubted whether, if it had attempted to delegate such power, the delegation would have had any force or validity. The imposition of a penalty would seem to be an exclusive legislative function, and one which may not be delegated. If the penalty was not of legislative origin, and power to impose the penalty was not attempted to be delegated by legislative power, as here, the penal provision is void ab initio.

It was not a thing essential to the exercise of the power granted to the Executive Department, or the exercise of any power inherent in that department in time of war. Right to revoke the granted permit was doubtless essential to the exercise of the power granted or inherent, and such right of revocation is elsewhere provided in the regulations. For a violation of the regulations it may be that some action or proceedings other than the revocation of the act might lie, but, if so, this is not such an action.

■ Even if the defendant had agreed to act as a central dealer under the regulations, which he did not do, or if his agreement to act as a country dealer under the regulations, which he speedily repudiated and abandoned, could have the effect of an agreement to operate under the regulations, no matter in what capacity he acted, or if his conduct in complying with the regulations in other respects than the payment of the alleged excess gross profits was equivalent to an agreement to operate either as a country dealer, or a central dealer, or both, under the regulations, considering the requirement to pay excess profits as a penalty, the defendant was not bound, if the McFarland Case correctly states the law. In that case the court said: "If the requirement to surrender excess profits was in the nature of a penalty, it would have been immaterial that the defendants had agreed that it should be imposed. One cannot by agreement subject himself to the payment of a penalty for something which he may hereafter do."

Nor is there force in the claim of subsequent ratification by the various acts of Congress relied upon by the government counsel. The acts of Congress upon which the government relies do not seem to support the contention that Congress ratified or adopted or validated the void penalties provided for in the regulations as pointed out in the McFarland Case. Even if it was the intent of the acts of Congress to do so, the action of the Congress in attempting, after the

completion of the act, to make that act subject to a penalty, would be in conflict with the Constitution.

It is not necessary to discuss any other questions involved in this case, and judgment must be for the defendant.

In the foregoing discussion of this case from a legal or judicial point of view, this court does not wish to be understood as in the slightest degree criticizing the Wool Division of the War Industries Board in the adoption of regulations, or in their application, or in the manner in which the wool clip of 1918 was handled. On the contrary, it seems to this court that there was a truly marvelous and most efficient handling of the whole matter of the acquiring and distribution of wool, with a practically complete elimination of profiteering, which is almost, if not quite, without parallel in the history of previous wars of any nation, and which was done, generally speaking, with an admirable and patriotic co-operation on the part of the wool growers and dealers.

It is regrettable that such decisions as this seem to put the Executive Branch of the government in the light of being compelled to commit a breach of faith with the wool growers, in whose behalf the excess profits provisions of the regulations were apparently prescribed; but it will doubtless be found that, under the conditions obtaining, which human knowledge could not entirely foresee, the dealers generally made little profit, because the profit limitation was probably too severe, and to take from them these so-called excess profits, even if not without legal authority so to do, would in most cases work injustice to the dealers.

The motion of the defendant to direct the jury to find a verdict for the defendant must be granted, the jury having been dismissed under a stipulation that there was no issue of fact, and that the court might direct a verdict for the plaintiff or defendant, according to its application of the law to the undisputed facts.