### UNITED STATES v. KRAUS et al.

Circuit Court of Appeal, Seventh Circuit.
June 20, 1929.

No. 4122.

J. S. Bohannan, of Washington, D. C., for the United States.

Samuel D. Miller, of Indianapolis, Ind., for appellees.

Before ALSCHULER, and PAGE, Circuit Judges, and LUSE, District Judge.

PAGE, Circuit Judge. Plaintiff, after demurrer was sustained, abided by its complaint; hence this appeal.

The question is: Does the complaint show a right in the government to recover from defendants, who were wool dealers at Ft. Wayne, Ind., the profits received by them from their dealings in the 1918 domestic wool clip, to the extent that such profits were in excess of a gross profit of 5 per cent. on their season's business?

The controversy grows out of what preceded and what followed the signing by defendants, and the delivery to the War Industries Board, of the following:

"I, the undersigned, having received from the Wool Division of the War Industries Board a permit to operate as an approved wool dealer in a distributing center, hereby agree to operate subject to the rules heretofore adopted or to be adopted by said Board for the handling of the 1918 Domestic Clip.

"My permit is subject to immediate revocation for failure to comply with said regulations."

A history of the handling of the 1918 domestic clip of wool under the Wool Division of the War Industries Board may be found in U. S. v. McFarland (C. C. A.) 15 F.(2d) 823, but it is necessary to refer to some legislation not there set out.

By act approved August 29, 1916 (39 U. S. Stats. at L. pp. 649, 650 [50 USCA § 3]), Congress established a Council of National Defense, consisting of designated members of the Cabinet, and provided therein that the Council should nominate to the President, and the President should appoint, an Advisory Commission. Many duties were imposed by the act on the Council of National Defense, and it was given broad powers, including: "The giving of information to producers and manufacturers as to the class of supplies needed by the military and other services of the Government, the requirements relating thereto, *and the creation of relations which will render possible in time of need the immediate concentration and utilization of the resources of the nation.* [Italics ours.]" The act also provided that the Council should adopt rules and regulations for the conduct of its work, etc.

On April 6, 1917, Congress, in a joint resolution, declaring that a state of war existed between the United States and Germany, provided: "That the President be, and he is hereby, authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial German Government; and to bring the conflict to a successful termination all of the resources of the country are hereby pledged by the Congress of the United States." 40 U. S. Stats. at L. p. 1.

By act approved May 20, 1918, Congress vested in the President, as Commander in Chief of the Army and Navy forces of the

Nation, very broad powers, and, among others are those provided in sections 2 and 5 thereof (40 U. S. Stats. at L. pp. 556, 557):

"Sec. 2. That in carrying out the purposes of this Act the President is authorized to utilize, coordinate, or consolidate any executive or administrative commissions, bureaus, agencies, offices, or officers now existing by law, to transfer any duties or powers from one existing department, commission, bureau, agency, office, or officer to another, to transfer the personnel thereof or any part of it either by detail or assignment, together with the whole or any part of the records and public property belonging thereto."

"Sec. 5. That should the President, in redistributing the functions among the executive agencies as provided in this Act, conclude that any bureau should be abolished and it or their duties and functions conferred upon some other department or bureau or eliminated entirely, he shall report his conclusions to Congress with such recommendations as he may deem proper."

Pursuant to the act of August 29, 1916, the President, on May 28, 1918, by Executive Order, established the War Industries Board as a separate administrative agency to act for him, under his direction. The functions of the War Industries Board, as outlined in a letter by the President on March 4, 1918, to Bernard M. Baruch, its chairman, were continued in full force and effect. Some of the functions of the Board were:

"The determination, wherever necessary, of priorities of production and of delivery and of the proportions of any given article to be made immediately accessible to the several purchasing agencies when the supply of that article is insufficient, either temporarily or permanently;

"The making of purchases for the allies.
* * *

"The chairman should be constantly and systematically informed of all contracts, purchases, and deliveries, in order that he may have always before him a schematized analysis of the progress of business in the several supply divisions of the Government in all departments.

"The duties of the chairman are:

"(1) To act for the joint and several benefit of all the supply departments of the Government; * * *

"(3) To guide and assist wherever the need for guidance or assistance may be revealed: For example, in the allocation of contracts, in obtaining access to materials in any way preempted, or in the disclosure of sources of supply; * * *

"(6) To anticipate the prospective needs of the several supply departments of the Government and their feasible adjustment to the industry of the country as far in advance as possible, in order that as definite an outlook and opportunity for planning as possible may be afforded the business men of the country."

There was created within the War Industries Board a department called "Wool Division of the War Industries Board."

May 21, 1918, seven days before the Executive Order, supra, the Wool Division issued regulations for handling the wool clip of 1918. It seems to be conceded by all parties that the government had appropriated all of the wool clip of 1918 to its own purposes, with the understanding that if all was not actually used by the government it would be, by the government, allocated to manufacturers as the government might direct. So far as here deemed necessary, the regulations provided:

"The necessities of the Government at this time are such as to require the use of all existing agencies for concentrating the wool near the centers of consumption. Therefore, all the wool of the 1918 clip must be distributed through approved dealers in approved centers of distribution.

"Approved Dealers Defined. Approved dealers shall be those dealers authorized by the War Industries Board to handle wool who are located in the distributing centers and who buy from growers direct, through agents, or from country merchants; and also those dealers authorized by the War Industries Board who are located in wool-growing districts, and who buy direct from growers and resell, or consign to the dealers in distributing centers. Approved distributing centers are the usual well recognized points of distribution."

After explaining the classification of the wool and the method of fixing prices, etc., to which was added advice to growers to pool their small productions, it was further provided:

"Government Price. Approved dealers in approved distributing centers will be required to open and grade all their purchases or consignments as rapidly as possible after the arrival of wool at point of distribution. Prices on all wool, as soon as graded, will be fixed by a Government valuation committee appointed for that purpose in the different distributing centers. Prices to be paid by the Government at distributing centers for such wool as it may require are to be those established as of July 30, 1917, at the Atlantic

seaboard markets. In addition to said prices the Government is to pay a further sum equal to 4 per cent of the selling prices to cover compensation or commission to approved dealers for their services in collecting and distributing wool. On wool not taken by the Government for its own use and which may be allocated for other uses, prices will also be fixed in accordance with July 30, 1917, values at Atlantic seaboard markets, and on such wool approved dealers shall be entitled to a commission or compensation of a sum equal to 4 per cent of the selling price, and this commission or compensation shall be a charge against said wool and shall be collected from the manufacturer to whom said wool is allocated.

*"Profiteering Prohibited.* As a guard against profiteering, the books of all approved dealers in distributing centers shall be at all times open to Government inspection, and if it be found that their gross profits, including the aforesaid commission of 4 per cent, are in excess of 5 per cent on the season's business then such gross profits shall be disposed of as the Government decides. The books of the country dealers shall likewise be open to Government inspection. If it be found that their gross profit for the season's business is in excess of 1½ cents per pound, then such excess profits shall be disposed of as the Government may decide."

In concluding that part of the regulations, there were named the approved distributing centers for fleece wools.

Although defendants were not located in one of the approved distributing centers, they were treated as such, and it is averred that they received from the War Industries Board, and that they accepted, retained, and used, a permit or license to operate as approved dealers in a distributing center in handling wool of the domestic clip for the year 1918, and that they thereupon executed the agreement above set out to operate under the rules of the War Industries Board.

The complaint further shows that defendants did conduct their business under and in compliance with the rules and regulations of the War Industries Board, and, pursuant thereto, paid to the government $17,026.73, as gross profits which they had made on the season's business in excess of the gross profits of 5 per cent., permitted by the Regulations of the Wool Division. It is averred that, upon further examination of defendants' books, it was found that the defendants had made, as additional excess profits, the sum of $24,278.05, the amount here sued for. Defendants contend that the regula-

tions promulgated by the Wool Division of the War Industries Board were invalid because they attempted to fix prices, etc.; that the alleged agreement was without consideration because defendants were already wool merchants and had the right to deal in wool unrestrained by the regulations, so that the contract signed by defendants lacked mutuality; that the alleged contract was too indefinite to be enforced; and that there is no right in the government to maintain this action.

Whether the regulations were invalid because of an attempt to fix prices we do not decide, as that question is not here involved. The prices fixed, in the manner provided by the regulations, were accepted in every case by defendants without objection.

Although defendants were wool merchants, they could not have handled wool in 1918 without the consent of the government, because the government had appropriated all wool for its own purposes and had the undoubted right to say by whom, as its agents, wool should be acquired from the growers, or other owners. The War Industries Board, and all of its subdivisions, were merely agents, speaking for the President, and so far as the regulations are involved, they are to be considered as his acts. In addition to his constitutional powers, the President had the broad powers hereinabove shown, vested in him by congressional action.

In the McFarland Case, supra, the court repeatedly stressed the fact that defendants there had not made the agreement, as alleged. In the instant case, on the contrary, defendants signed the agreement, as alleged, after they had been told of the government's interest, its regulations, and that the government required that the wool be distributed through its approved agents. When defendants signed the agreement, they also knew that the government would pay them a commission of 4 per cent. "to cover compensation or commission to approved dealers for their services in collecting and distributing wool," and that the same arrangements had been made by the government for such dealers as to all wool allocated by the government to manufacturers.

The defendants commenced and continued to act as government agents in exact accordance with the regulations, and were paid by and received from the government and the manufacturers, to whom wool was allocated by the government, the prices and the commissions that were not provided for in any other way than in the regulations. Although the defendants were, in a sense, buyers and

sellers of wool, yet they were only such, in 1918, as agents for the government, acting for a commission paid by the government. The government had the right, in those extraordinary times, to protect sellers of wool, by providing that out of all of the transactions the government's agents should not have more than the specified profit, and that whatever those agents gained in addition thereto should be disposed of as the government might decide.

We are of opinion that defendants are bound by the contract alleged.

There is much discussion about the question as to the uncertainty of what is meant by "gross profits" and "season's business." Those are matters over which we have no concern, because they may be made certain by evidence, upon the trial of the case. It may be shown that, as between plaintiff and defendants, there was no uncertainty as to the meaning of those terms.

It is strongly urged that the government is without right to maintain this suit. Referring to Executive Order No. 2868, dated May 28, 1918, and to his letter of March 4, 1918, to the Chairman of the War Industries Board, the President on December 31, 1918, by Executive Order, dissolved the War Industries Board, and by section 3 disposed of the matters theretofore under the control of the Wool Division of the War Industries Board as follows:

"3. That the powers and functions of the wool division of the War Industries Board, including particularly those relating to the payment by the dealers or buyers of any sums due by them in accordance with the 'Government regulations for handling wool clip of 1918,' as established by said board on May 21, 1918, and the disposition of such payments, shall, on January 1, 1919, be transferred to and thereafter exercised by the Bureau of Markets of the Department of Agriculture, until such time as the affairs and duties of said division, uncompleted on said date, shall have been finally completed and wound up."

In the 1919 appropriation bill, Congress provided as follows:

"To enable the Bureau of Markets to complete the work of the Domestic Wool Section of the War Industries Board and to enforce the Government Regulations for handling the wool clip of 1918 as established by the Wool Division of said Board, pursuant to the Exec-

utive Order dated December 31, 1918, transferring such work to the said Bureau, $35,000." (41 U. S. Stats. at L. p. 267).

In 1920, it made an appropriation for the same purpose. 41 U. S. Stats. at L. p. 725.

In 1921, another appropriation was made, and, to what was said in the former appropriations, there was added: "And to continue, as far as practicable, the distribution among the growers of the wool clip of 1918 of all sums heretofore or hereafter collected or recovered with or without suit by the Government from all persons, firms, or corporations which handled any part of the wool clip of 1918." 41 U. S. Stats. at L. p. 1343.

The acts of 1922, making further appropriations, used the same language, substantially, as that in the 1921 act. 42 U. S. Stats. at L. pp. 445, 533.

Although it was not stated in the acts that these suits should be brought by the government, yet there is in them sufficient to justify the conclusion that it was the intention of Congress that the excess wool profits should be collected, either by settlement or by suits brought by the United States government.

In a case similar to the instant one, Judge Morton, in 1923, sitting in the District Court of Massachusetts (U. S. v. Smith, 285 F. 751), overruled a demurrer to the declaration, but upon the trial of the case ([D. C.] 32 F.(2d) 901, opinion filed May 22, 1929) the same judge, relying largely upon the McFarland Case, supra, reached a different conclusion and found the issues for the defendant.

In 1921, Judge Sessions, of the Western District of Michigan, upon similar facts, sustained the right of action. U. S. v. Powers (D. C.) 274 F. 131.

In 1922, in the District Court for the Southern District of Ohio, Judge Sater, in U. S. v. Gordin, 287 F. 565, after a very careful consideration of the questions involved, overruled a demurrer to the declaration. The Gordin Case was before the Court of Appeals, and was affirmed on a question of practice. 9 F.(2d) 394.

In U. S. v. Traugott Schmidt & Sons (D. C.) 2 F.(2d) 290, the same question was before Judge Tuttle, who denied a motion to dismiss the declaration.

The judgment is reversed, with directions to overrule the demurrer.