UNITED STATES v. SMITH.

SAME v. BROWN et al.

Nos. 2399, 2400.

Circuit Court of Appeals, First Circuit.

April 11, 1930.

Judson S. Bohannan, Assistant to Solicitor, Department of Agriculture, of Washington, D. C. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., and Elton L. Marshall, Sol., Department of Agriculture, of Washington, D. C., on the brief), for the United States. ·

Lothrop Withington, of Boston, Mass. (Sherman L. Whipple and Claude B. Cross, both of Boston, Mass., on the brief), for appellees.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge.

These are actions at law to recover what are termed excess gross profits under certain regulations issued by the so-called Wool Division of the War Industries Board under date of May 21, 1918, with the purpose of controlling the collection and distribution of the wool clip of that year.

After the court below had overruled the defendant's demurrer in each case and permitted the defendant to answer to the merits, by stipulation of the parties in writing waiving a jury under section 649, Rev. St. (section 773, title 28, USCA), both cases were withdrawn from the jury and tried before the court. On motion, the court below ordered judgment for the defendant in each case.

While the cases were heard separately below, they were argued together before this court, and, as they involve similar questions, may be disposed of in one opinion.

At the outset we are met with the contention by the defendants that upon the record in each case no question of law is raised for review in this court.

In the case against Smith, while the government requested certain rulings of law, the record does not show that they were refused by the trial judge, except as it may be implied in his opinion. According to the record, the only exception taken was an exception to the order of judgment for the defendant.

In the case against Brown et al. the government made requests for both rulings of law and findings of fact, and the bill of exceptions in that case states that the several requests for rulings of law and findings of fact were refused and exceptions taken. The exceptions to the findings of fact, however, have been waived—probably for the reason that whether the court on request shall make special finding of facts is discretionary and its refusal is not reviewable. Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 480. The plaintiff in the Brown case also assigned as error that "the court erred to the prejudice of plaintiff in rendering judgment in favor of defendant and against the plaintiff upon the facts stipulated herein."

Although the Act of March 4, 1865, now sections 649 and 700 of the Revised Statutes (28 USCA §§ 773, 875), was enacted more than sixty-five years ago, and has frequently been the subject of construction by the courts, "nevertheless, it has been, and is yet, the source of much uncertainty at the bar, and some conflict in the decisions, both as to what questions are open for review and what procedure is necessary to secure such review in an appellate federal court." Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 480.

That the uncertainty and conflict in the decisions are not overstated in the above case will be disclosed by an examination of the decisions from Norris v. Jackson, 9 Wall. 125, 19 L. Ed. 608; Dirst v. Morris, 14 Wall. 484, 20 L. Ed. 722; Mercantile Ins. Co. v. Folsom, 18 Wall. 237, 21 L. Ed. 827; Cooper v. Omohundro, 19 Wall. 65, 22 L. Ed. 47; and Searcy County v. Thompson (C. C. A.) 66 F. 92; to Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 480; Newlands v. Calaveras Min. & Mill Co. (C. C. A.) 28 F.(2d) 89; Talent v. United States (C. C. A.) 32 F.(2d) 630; Law v. United States, 266 U. S. 494, 45 S. Ct. 175, 69 L. Ed. 401; and Fleischmann Co. v. United States, 270 U. S. 349, 48 S. Ct. 284, 70 L. Ed. 624.

Prior to the act of 1865 (13 Stat. 500), if a case was submitted to the court without a jury, a finding of the facts, whether general or special, was not a judicial act. The court in such a case acted in the capacity of referee or arbitrator, and of its findings of fact or rulings of law there was no review in the appellate courts. Campbell et al. v. Boyreau, 21 How. 223, 226, 16 L. Ed. 96; Campbell v. United States, 224 U. S. 99, 105, 32 S. Ct. 398, 56 L. Ed. 684; Bank of Waterproof v. Fidelity & Deposit Co. (C. C. A.) 299 F. 478, 479.

Where, however, there was a special finding of facts by a jury, or the "ultimate facts" were agreed upon by the parties and made a part of the record, and all that remained to determine the rights of the parties was a question of law for the court, the judgment of the court could be reviewed on a writ of error, though no exceptions were taken, since the error, if any, appeared on the record. Suydam v. Williamson, 20 How. 427, 434; 15 L. Ed. 978; Insurance Co. v. Boon, 95 U. S. 117, 125, 24 L. Ed. 395; Allen v. St. Louis Bank, 120 U. S. 20, 30, 7 S. Ct. 460, 30 L. Ed. 573; Seeberger v. Schlesinger, 152 U. S. 581, 586, 14 S. Ct. 729, 38 L. Ed. 560. "The Act of 1865 was not intended to interfere with this practice." Supervisors v. Kennicott, 103 U. S. 554, 556, 26 L. Ed. 486.

Under section 649, Rev. St. (28 USCA § 773) authorizing the waiving of jury trials, the findings of fact by the court have the same effect as a verdict of jury. If, therefore, in a jury waived case under this section the finding of facts is general, no question of law is raised thereby, and the only questions of law in such a case that can be reviewed are on rulings made in the progress of the trial, as is provided in section 700, Rev. St. (28 USCA § 875). If, however, the court in a jury waived case makes special findings of the ultimate facts, or they are agreed upon

by both parties, and thus have the effect of special findings, Supervisors v. Kennicott, supra, then as in the case of special findings by a jury, the sufficiency of the facts to support the judgment was formerly reviewable on a writ of error, and now is reviewable on appeal. Streeter v. Sanitary Dis. of Chicago (C. C. A.) 133 F. 124, 127; Fleischmann Co. v. United States, 270 U. S. 349, 356, 46 S. Ct. 284, 70 L. Ed. 624.

Out of the plethora of cases construing the act of 1865, the following rules applicable to jury waived cases may be deduced, and on which the decisions are substantially in accord.

■■ If the findings of the court are general, only such rulings as are made in the progress of the trial are reviewable. A trial is still in progress within the meaning of the statute until the case is submitted to the trial judge for final determination. No exception lies to a final judgment based on general finding of facts. Wilson v. Merchants' Loan & Trust Co., 183 U. S. 121, 22 S. Ct. 55, 46 L. Ed. 113; United States Fidelity & G. Co. v. Com'rs (C. C. A.) 145 F. 144, 151.

If, however, the ultimate facts are agreed upon by the parties, or the trial judge makes special findings of all the ultimate facts, so that the rights of the parties become purely a question of law, the final conclusion of the court is reviewable, at least on exceptions to a refusal of a motion for a judgment by the losing party. Bank of Waterproof v. Fidelity & Deposit Co., supra; St. Louis v. Western Union Tel. Co., 148 U. S. 92, 13 S. Ct. 485, 37 L. Ed. 380; Fleischmann Co. v. United States, supra.

■ If the parties stipulate as to the ultimate facts, it in effect amounts to a special finding of facts by a jury (Supervisors v. Kennicott, supra), and whether the jury is waived under section 649, Rev. St. (28 USCA § 773) or the case is merely withdrawn from the jury and submitted to the court without compliance with that section, the ruling of the trial judge in ordering judgment for either party, though no exception thereto be taken by the losing party, is reviewable, formerly on writ of error, and now on appeal. Suydam v. Williamson, supra; Seeberger v. Schlesinger, supra.

■ It is difficult to lay down a rule, however, that will exactly prescribe the boundaries within which the "ultimate facts" in every case are confined. They are described in Universal Oil Products v. Skelly Oil Co. (D. C.) 12 F.(2d) 271, 272, as "found in that vaguely defined field lying between the evidential facts on the one side and the primary issue or conclusion of law on the other." It will depend on the issue, but in general they include all those facts necessary to be found in a given case in order that the determination of the right of the parties shall become a pure question of law. Supervisors of Wayne County v. Kennicott, supra; Raimond v. Terrebonne Parish, 132 U. S. 192, 194, 10 S. Ct. 57, 33 L. Ed. 309; Grayson v. Lynch, 163 U. S. 468, 472, 16 S. Ct. 1064, 41 L. Ed. 230.

■ If an agreed statement of facts or a special finding by the trial court leaves any fact, which is necessary to establish the rights of the parties, to be determined by the court from conflicting evidence, or even from inferences to be drawn from admitted facts or undisputed testimony—unless, perchance, the inference is an inevitable conclusion from the undisputed testimony or from the facts so agreed upon or found—no issue of law is raised on such an imperfect statement or special finding. The final conclusion of the trial court in such case would not be reviewable in the appellate courts either on a writ of error or on appeal upon exceptions to the judgment. Wilson v. Merchants' Loan & Trust Co., supra. It is unnecessary to discuss the other questions raised by counsel involving the jurisdiction of this court.

In the case against Smith there were no rulings during the progress of the trial, and an exception only to the order of judgment. It is obvious, therefore, that in this case, there being no special findings of fact, unless the stipulation of the parties admits all the ultimate facts, the finding of facts by the trial court must be held to be general, and an exception to the final order of judgment raises no question of law that is reviewable here. Wilson v. Merchants' Loan & Trust Co., supra.

It is strenuously urged by the government, however, that the stipulation of facts set forth in the record was intended by the parties to contain all the facts, and therefore only a question of law was left for the court, and that the court below so viewed it; and, if there appears any statement or exhibits in the nature of evidentiary facts, they were added out of abundance of caution, and merely to supply the background of the ultimate facts, all of which are contained in the stipulation; and that the stipulation itself expressly states that it contains "all the facts in the case."

We have grave doubts whether the stipulation in these cases complies with the rule that none of the ultimate facts must be left

to inference even from admitted facts, unless no other reasonable inference is possible than the existence of the essential ultimate fact or facts. We do not think that under this rule the appellate courts should be compelled to examine records of four hundred pages, including stipulations, correspondence, and oral testimony to determine whether all the ultimate facts in a given case are agreed to. However, rather than summarily dispose of these cases solely on technical grounds, we will pass to a consideration of the merits upon the assumption that all the ultimate facts are agreed upon or are a necessary inference from the record as claimed by the government.

The history of the steps taken by the government to ensure a supply of necessary war materials, including wool for the manufacture of clothing and blankets for our soldiers and sailors, is found in the opinion of the court in United States v. McFarland (C. C. A.) 15 F.(2d) 823, and was adopted as a part of the record in the cases now at bar as containing a correct statement of facts in this particular.

It is unnecessary to state them again with the fullness found in that case. To summarize it briefly: Congress in 1916, in anticipation of our entry into the war, created a Counsel of National Defense composed of six of the Cabinet members. In July, 1917, after our entry into the war, the Council of National Defense, with the approval of the President, organized what was termed the War Industries Board, to furnish "needed assistance and advice" to the departments engaged in making purchase of war materials.

In March, 1918, the President, with or without authority, removed the War Industries Board from its subordination to the Council of National Defense, which he confirmed by executive order in May, 1918, apparently under the Overman Act of May 20, 1918 (40 Stat. 556), and made it an administrative agency directly responsible to him.

The President instructed the reorganized Board that its duties acting through its chairman were: "To act for the general and several benefit of all the supply departments of the government; to let alone what is being successfully done and to interfere as little as possible with the present normal purchase and delivery in the several departments; to anticipate the prospective needs of the several supply departments of the government and their feasible adjustments to the industry of the country as far in advance as possible"; and, in brief, to act as the "general

eye" of all supply departments in the field of industry.

An examination of the several war acts passed by Congress and of the instructions of the President to the Board will disclose that its duties were limited chiefly to making surveys of the sources of supplies for our national defense and for prosecuting the war, their availability and the existing means and equipment for placing them at the convenient disposal of the government; to ascertaining the cost of war materials; and to furnishing all the information thus obtained to the President and to the several purchasing agencies of the government. It had, however, no authority to fix the prices at which material should be furnished the government, or to commandeer materials however necessary for the national defense or the prosecution of the war. It could suggest and recommend, but could not order. The power to compel obedience was vested in a higher authority. Its chief duty was as a purveyor of necessary information as to available war supplies, to assist in the co-ordination of production and transportation to the needs of the nation, and to give advice to the heads of the several departments.

In pursuance of these duties, it created certain so-called "commodity sections," the function of which was to investigate particular industries and advise as to conditions, and to assist the Board in co-ordinating the particular production of each with the government's needs. The War Industries Board could, of course, confer upon these commodity sections only such powers as itself possessed.

By reason of the anticipated imperative needs of the government for wool in order to furnish blankets and clothing for the Army and Navy, there was created by the War Industries Board in the spring of 1918, among other commodity sections, the "Wool Division." The function of this division was to investigate the conditions in the wool trade and advise as to the best method of handling the wool clip of 1918 and of obtaining a sufficient supply for the pressing needs of the government.

In April, 1918, the Wool Division called together at Washington representatives of the wool growers and the wool dealers of the country. Prior to the war, the wool trade had been handled by men known as wool dealers who purchased the wool each year from the growers who were, of course, scattered all over the country and collected it in warehouses in the larger centers chiefly in

the east where it was graded and sold to the manufacturers.

From the stenographic report of these conferences it is at once apparent that as a whole the members of the Wool Division at the outset had little practical knowledge of the wool trade. They were conscious of the power of the government behind them to commandeer, if necessary, but it became evident in the early stages of the conferences that the commandeering of the wool in the hands of the growers was to be avoided, if possible. Several members of the Wool Division apparently regarded the wool dealers with suspicion and considered it their special duty to protect the growers and the government against profiteering by the dealers, although all, both growers and dealers, expressed the most patriotic purpose and earnest desire unselfishly to assist their country in its hour of stress.

The Wool Division, while on occasions during the conferences it exhibited a tendency to use, in the nature of a club, the power of the government to commandeer, recognized from time to time during the conferences that neither the division nor the Board possessed that power, and that the only service it could render was to bring about, if possible, an agreement with the growers as to what they should receive for their wool and with the dealers as to what the government should pay when delivered. It did, however, assume that it had the power to prescribe a course of procedure that would ensure the carrying out of any agreement as to prices and prevent profiteering by licensing as approved dealers only those who should agree to certain conditions, and who should do the buying and collecting of the wool in the warehouses where it would be purchased and allocated to the manufacturers by the government.

The record, however, does not show that any definite method of procedure was agreed upon at the conferences, either with the growers or the dealers. The growers proposed a plan, but, so far as the record discloses, the dealers offered no suggestions, nor were they apprised of the plan suggested by the growers. The Wool Division, however, did not adopt the plan of the growers, but evolved one of their own.

Having come to an understanding as to what the wool dealers would accept for the wool which they then had on hand, and what would be a satisfactory price to the growers for their 1918 clip, and on what terms the wool dealers would collect, store, and handle it, the Wool Division proceeded to draft so-called regulations for the conduct of the wool business in 1918, and which bear the somewhat imposing title of "Government Regulations for Handling the Wool Clip of 1918, Established by Wool Division, War Industries Board, May 21, 1918."

They apparently proceeded on the theory, and the impression seemed to have been imparted to the growers and dealers, that the wool clip of 1918 was in effect being taken over by the government. The regulations begin by stating that the government shall have the prior right to acquire all the wool clip of 1918; that all this wool must be distributed through approved dealers; that, to become an approved dealer, one must apply to the Wool Division for a permit, and only those approved dealers so authorized could handle any of the wool; and, to prohibit profiteering all dealers in the distributing centers or "approved dealers," as they were termed, whose books showed for the season of 1918 gross profits in excess of 5 per cent., should dispose of such excess as the government decided.

Upon the issuing of such permit to dealers by the chief of the Wool Division, a form acknowledging receipt of the permit was forwarded, which contained also an agreement to operate subject to any rules heretofore or hereafter adopted by the Board. It is upon this form of agreement that the government now relies as a contract to recover of the defendants the excess gross profits alleged in its declarations.

But neither the Wool Division nor the Board was an agency of the government clothed with any authority to enter into contracts in behalf of the government for any purpose; nor is a license, or permit, to do business a contract, even when duly authorized, Lowell v. Archambault, 189 Mass. 70, 75 N. E. 65; Railway Co. v. Philadelphia, 101 U. S. 528, 537, 25 L. Ed. 912; 17 R. C. L. 476; nor does an acceptance of a license upon the condition that the licensee will conform to certain regulations or statutes bind the licensee to conform to invalid regulations, W. W. Cargill Co. v. Minn., 180 U. S. 452, 468, 21 S. Ct. 423, 45 L. Ed. 619; Power Mfg. Co. v. Saunders, 274 U. S. 490, 497, 47 S. Ct. 678, 71 L. Ed. 1165.

Nor did acceptance of the prices agreed upon at the conferences estop the wool dealers from refusing to conform to what they considered unauthorized, invalid, and inequitable conditions. To have refused to assist with their organization would probably have resulted in the commandeering of wool and

consequent delay, which it had become apparent the government wished to avoid, if possible. We think the dealers were warranted in proceeding so far as possible in accordance with their agreement as to prices, and, when the necessities of the nation ended, to rely on the courts to protect them from any unauthorized conditions imposed on them. Morrisdale Coal Co. v. United States, 259 U. S. 188, 190, 42 S. Ct. 481, 66 L. Ed. 892; Frost v. Railroad, 271 U. S. 583, 592, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; So. Pac. Co. v. Denton, 146 U. S. 202, 13 S. Ct. 44, 36 L. Ed. 942; United States v. McFarland (C. C. A.) 15 F.(2d) 823.

■■■■ Without some legislative or executive order that prohibited the doing of any wool business without a permit, any license or permit issued by the Wool Division or any conditions imposed by it upon which such permit could be exercised had no validity or binding force. The wool dealer, until such legislative or executive act was taken, could lawfully conduct his business in any manner he saw fit. In any event, an agreement to conduct his business according to any rules adopted by the War Industries Board could only mean rules within their authority to adopt.

■■■■ The government has already abandoned the claim that the regulations originally had any validity as such, and concedes that neither the division or the Board had authority to regulate the conduct of any business in this manner. It is urged by the government, however, that, notwithstanding the regulations originally had no binding force, they have been ratified by Congress in making appropriations for the expense of collecting by suit or otherwise such excess gross profits and the distribution of them; but, whatever inference of ratification can be drawn from these acts, any inference of ratification of the regulations is overcome by Congress deliberately refusing to adopt a provision declaring the regulations to be valid, a clear indication that by appropriating the funds it did so with the distinct understanding that it thereby gave no additional effect to the regulations of the Wool Division, which they did not originally possess, and left that for the courts to determine.

The government cannot successfully contend that the regulations were a proposal for a contract between the wool dealers and the government. They must stand or fall as they were originally intended, viz., as regulations.

■■■■ The Wool Division evidently contemplated that the growers would in the main consign their wool to the dealers and would receive the government price, less the dealers' profit agreed upon, and expense of transportation; and that the dealer would receive from the government the profit or commission agreed upon in the conference. If it had worked out that way in practice, there would have been no question of excess gross profits. But in practice it appeared that the grower needed cash. He was not satisfied to accept or take the risk of the government grading and delayed payments. As a result, the dealers in 1918 bought a greater part of the wool clip at such prices as they and the growers agreed upon. It was a completed transaction so far as they were concerned. No grower, so far as appears, has made any claim that he did not receive for his wool the full price for which he parted with title to it. A dealer in buying stock took all risk of the government not accepting his grading, and was obliged to buy at prices to protect himself against this risk. The regulations did not provide what the government should do with the excess gross profits, if any. Since no complete record was kept by country dealers of the small growers of whom they purchased wool, the government has not yet been able to distribute what it has already received from other dealers than these defendants as excess gross profits. As a result, an attempt to restore any "excess gross profits" to the growers is not only impractical but inequitable. Some growers will receive an additional sum for their wool, others will not. To take money now from the defendants and distribute it among growers who have received all they asked for their wool on an unconditional sale is in effect to take the property of one citizen and distribute it as a gratuity to another.

These two cases differ but slightly in point of fact from several others previously brought by the government to recover "excess gross profits" under these regulations, and particularly United States v. Gordin (D. C.) 287 F. 565; Id. (C. C. A.) 9 F.(2d) 394; United States v. McFarland (C. C. A.) 15 F.(2d) 823; United States v. Avery (D. C.) 30 F.(2d) 728; United States v. Kraus et al. (C. C. A.) 33 F.(2d) 406. In only one case yet reported has there been a full consideration of these questions on the merits.

In United States v. Gordin (D. C.) 287 F. 565; Id. (C. C. A.) 9 F.(2d) 394, decided prior to the McFarland Case, it was assumed in the District Court that the regulations were duly authorized and valid, but it was

significantly held, as bearing on the right of the government to bring such action, that it did not appear that it had suffered damage ·from any breach of the alleged agreement, and only $1 was awarded as damages. On ·appeal, the case went off on the ground that, as there was no special finding of facts by the trial court, no question for review was raised. Whether there was any stipulation of facts does not appear.

In the McFarland Case, 15 F.(2d) 823, the Circuit Court of Appeals in a full opinion considered the whole situation, and, while there was no signed agreement by the defendant in that case to conform to the rules of the Board, if the regulations were in the nature of a contract or a proposal for one, the acceptance of any benefit under them might well have been considered as an agreement to conform to them. The court, however, after a review of the statutes, held the regulations to have been unauthorized and of no binding force, and the provision as to profiteering to be of the nature of a penalty, and affirmed the decision of the District Court in favor of the defendant. The case was then taken to the Supreme Court on certiorari, assigning as one ground of error that the regulations had been held to be invalid; but, when counsel for the government in argument admitted that they were unauthorized, the case was dismissed with a per curiam. 275 U. S. 485, 48 S. Ct. 27, 72 L. Ed. 386.

In the case of United States v. Avery, 30 F.(2d) 728, the District Court held, following the McFarland Case, that the profiteering provision was in the nature of a penalty, and the contention of the government that Congress by its appropriation had ratified the issuing of the regulations could not be maintained, and, even so, Congress could not ratify the imposing of a penalty after the act was committed. Such a conclusion would not be without some basis in law, if the regulations had any validity as such.

In the case against Kraus et al. (C. C. A.) 33 F.(2d) 406, the case went off on demurrer and not on the merits after a full hearing, as in the McFarland Case. The Circuit Court for the Seventh Circuit on appeal, though much of its reasoning on the issues raised on demurrer seems like dicta, held that the War Industries Board was acting as the agent of the President in adopting the

regulations. In the cases at bar, however, the record does not disclose that the Board ever took any action on the regulations adopted by the Wool Division; nor does it appear from the statutes and executive orders that the President ever gave his agents, if such they were, any authority to adopt such regulations.

The court in the Kraus Case also adopted the view that the wool dealers were acting as agents of the government in handling the wool, but the record in the instant cases does not bear out this view. The wool dealers bought of the growers at a price agreed upon between them. They took all risk of loss from government grading. All the wool acquired by the government in 1918 was purchased by the Quartermaster's Department under definite contracts after the grading of each particular lot of wool was approved and valued by government experts. The dealers were not treated as agents in their transactions with the government.

While there are grounds on which the McFarland and Avery Cases can be distinguished from the cases at bar, the general principles there laid down are in the main sound and applicable to the cases now under consideration.

On its merits the case against Brown et al., which differs from that against Smith in point of facts only in this respect, that Brown participated in the conferences with the Wool Division and knew of the provisions of the regulations when applying for a permit, must also be decided in the favor of the defendants, and on the grounds above stated. Even if there were reviewable rulings in the progress of the trial, any error therein was not prejudicial, since upon the facts stipulated the plaintiff in either case is not entitled to recover.

The supplementary evidence introduced in the Brown case, consisting of correspondence between the chief of the Wool Division, the Wool Administrator, and the Quartermaster's Corps, was, as held by the trial court, immaterial and irrelevant, in view of the opinion held by the court.

The decision of the District Court in each case is affirmed.

ANDERSON, Circuit Judge, concurs in the result.